[Civ. No. 2295.    Third Appellate District.—October 28, 1921.]

## C. C. HARDWICK, Appellant, v. BOARD OF SCHOOL TRUSTEES OF FRUITRIDGE SCHOOL DISTRICT, etc., et al., Respondents.

[1] CONSTITUTIONAL LAW — REASONABLENESS OF PUBLIC LAWS AND REGULATIONS — RIGHT OF COURT'S REVIEW. — The courts have the right to look into a public law or a local ordinance or regulation for the purpose of determining whether, upon its face, it is reasonable or in its operation will be unreasonably burdensome upon the body of citizens to which it may be applicable, and if it is found to be oppressive in its effect when put in operation or violative of any of the fundamental rights of any person or set of persons, it will and should be nullified by judicial fiat as unconstitutional and void, notwithstanding the legislature or the governing board enacting or adopting such law or ordinance or regulation has passed upon the facts upon which the law or ordinance or regulation is based and made a determination that it is reasonable or that it will not impose unreasonable burdens upon those who come within the purview of its terms.

[2] ID. — GUARANTEE OF RELIGIOUS LIBERTY — RIGHT OF INDIVIDUAL TO PROTECTION.—The constitutional guarantees contained in the first amendment to the federal constitution and in article I, section 4, of the state constitution invest every citizen with the right to worship Almighty God according to the dictates of his own conscience, free from molestation or interference by the legislature or any other power in the government, so long as such worship is not offensive to the common sentiments of civilized mankind or is not against the public peace and good order; and to entitle a person to the protection of such constitutional guarantees, it is not necessary that he be a member of any church or other religious society.

[3] ID. — PARENTAL AUTHORITY OVER CHILDREN — RIGHT OF STATE TO ELIMINATE.—The state has not the right to enact a law or confer upon any public authorities a power the effect of which would be to alienate in a measure children from parental authority and thus eliminate the parents from consideration in the matter of the discipline and education of their children along lines looking to the building up of the personal character and the advancement of the personal welfare of the latter, provided the views of the parents affecting the education and disciplining of their children are reasonable, relate to matters in the rearing and education of their children as to which their voice and choice should first be heeded, and are not offensive to the moral well-being of the children or inconsistent with the best interests of society.

[4] SCHOOL LAW—DANCING AS PART OF CURRICULUM—COMPULSORY EN. FORCEMENT—CONSCIENTIOUS SCRUPLES AND RELIGIOUS BELIEFS OF PARENTS.—Children may not be compelled, on pain of expulsion from school and of denial of the right to attend any public school, to dance the waltz, the polka, the two-step, or a dance similar to the fox-trot, wherein the children are required to dance in couples, usually a male and a female, their arms clasped around or about the shoulders of each other, where such form of dancing is offensive to the conscientious scruples and contrary to the religious beliefs and principles of the children as well as of their parents, notwithstanding such dancing exercises have been included within the curriculum of the school under the supposed authority vested in the school authorities of the state by section 1668 of the Political Code, authorizing the introduction into the public schools of a system of manual or physical training.

[5] ID. — REFUSAL OF CHILDREN TO DANCE ROUND DANCES — RIGHT OF TRUSTEES TO EXPEL.—A board of school trustees has no right to expel children from school for their refusal, in obedience to their parents' command, to dance the waltz, polka, two-step, or a dance similar to the fox-trot or any other dance wherein the children are required to dance with partners of the opposite sex with their arms clasped around or about the shoulders of their dance partners, where such exercise is offensive to the conscientious scruples and contrary to the religious beliefs and principles of the said children and of their parents. (Opinion of supreme court on denial of hearing.)

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Reversed.

The facts are stated in the opinion of the court.

Meredith, Landis & Chester for Appellant.

Hugh B. Bradford for Respondents.

HART, J.—The appellant, C. C. Hardwick, is and was, at the time of the initiation of this proceeding, a resident and elector of Fruitridge School District, in Sacramento County, and was and is the father of Irma Hardwick, aged thirteen years, and Douglas Hardwick, aged nine years. These children had been, at all times down to the happening of the circumstance leading to the controversy responsible for this action, attending said school as students therein. Included within the curriculum of said school, as the same was established by the school authorities (the defendants, trustees), are dancing exercises, inaugurated under the supposed authority vested in the school authorities of the state by section 1668 of the Political Code, authorizing the introduction into the public schools of a system of manual or physical training.

The remaining parts of the story may best be told in the language of the petition or complaint as follows:

"That in the teaching of such dancing the said children were and are taught among other dances, the following: 'Ace of Diamonds,' 'Minuet,' 'Norwegian Mountain March,' and 'Children's Polka,' or what was formerly known as the 'Quadrille'; that in the formation of some of said dances, girls have boys as partners at times, and when boys are not available girls are designated to represent boys so as to form couples; that in such dancing the said children are taught the 'waltz' step, the 'polka' step, the 'two-step' and what is equal to the 'fox-trot'; that after such instructions are given for a period of time said children are prepared to participate on the regular dance floor, in up-to-date dancing.

"That at the direction of plaintiff and his wife, Florence A. Hardwick, the said children of plaintiff, Irma and Douglas Hardwick sought to be excused from joining in such dancing on the grounds that such exercise was offensive to the conscientious scruples and contrary to the religious beliefs and principles of the said children and of plaintiff and his said wife; that plaintiff and his wife sought to have the said trustees and the principal of said Fruitridge School introduce in said school some other game or form of

physical exercise for the benefit of children opposed to dancing; that the principal and trustees of said school refused to do so and insisted that plaintiff's said children join in the said dancing.

"That plaintiff and his said wife thereupon refused to allow their said children to join in such dancing for the reasons aforesaid; that on or about the 4th day of March, 1920, because of the refusal of the said children to join in such dancing, the said trustees expelled the said Irma Hardwick and Douglas Hardwick from attendance upon said school.

"That. the said children are now without authority or right to attend any public school, contrary to law; that the expelling of said children from the said Fruitridge School by the said Board for refusing to join in said dancing is without authority in law.

"That plaintiff has demanded of the said School Board that his children be reinstated in said school and that they be excused from joining in the said dancing, but the said trustees have refused and still do refuse to reinstate the said children in said school or to transfer them to another."

The prayer of the petition was for a writ of mandate, directed to F. F. Silva, R. L. Ennis, and F. C. Brosius, as the board of trustees of said Fruitridge School District, commanding them, as such board of trustees of said school district, to reinstate the said Irma Hardwick and Douglas Hardwick in the said Fruitridge School, in said district, and for five hundred dollars damages.

A demurrer, upon both general and special grounds, was interposed to the complaint. The special grounds are:

"(1) That said complaint is uncertain in this: That it does not appear what sort of dances are the following: 'Ace of Diamonds,' 'Minuet,' 'Norwegian Mountain March,' and 'Children's Polka,' or what was formerly known as the 'Quadrille,' nor how said dances are executed.

"(2) That said complaint is uncertain in this: That it does not appear to what church discipline plaintiff subscribes, nor in what way the matter of said children so dancing conflicts with said conscientious scruples and religious beliefs and principles either of said plaintiff or of the said children of the said plaintiff."

The demurrer was sustained and leave granted plaintiff to file an amended complaint within ten days from the date of the decision on the demurrer. The plaintiff refused to amend the complaint, and judgment was thereupon entered refusing to issue the writ of mandate as prayed for.

The appeal is by the plaintiff from said judgment.

The argument of the respondents in support of the order sustaining the demurrer and the judgment thereupon entered is strictly in line with the hypothesis of the special grounds of the demurrer. It is in part that, to state a case, the plaintiff must disclose what his particular religious beliefs or principles are, or show that he is a member of or affiliated with some religious organization which is opposed to dancing under any and all circumstances or at any time. "So far as appears from the complaint," proceeds the argument, "plaintiff's religious . beliefs are personal to himself and different from those of every other person in the state." It is asserted that if the complaint here is to be held sufficient in the statement of a cause for the granting of the relief asked for, the defendants would be at the great disadvantage of not being able to answer it; that they could not deny that the "folk-dances" or games taught in the schools were offensive to the religious scruples of the plaintiff, "because plaintiff alone knows what these scruples are." The argument proceeds: "At the trial of such a case all that the plaintiff would have to do would be to prove that certain things were done or taught in the schools, and then testify arbitrarily that these things were against his conscience and religion, and he would have them prohibited. . . . How could the people or the school authorities disprove the testimony of a man who stated that anything done in the schools was offensive or contrary to his religion? If this complaint is good, another stating that the mathematics or the chemistry or the letters or the history taught was contrary to anyone's religious beliefs would be equally good." Further proceeding, the respondents declare that the powers vested in school boards by the legislature are to be exercised fully and freely, without interference by the courts; that the decision of said boards as to any matter coming within the scope of their powers is conclusive and can only be set aside or disregarded in cases where fraud is shown or the decision is

"so clearly contrary to the fact, or so unreasonable or oppressive, as to imply fraud or show bad faith." From this postulate, it is argued that, when the matter of inaugurating dancing as a part of the curriculum of the public schools came before said board it was for that body to determine whether such exercises were opposed to the religious scruples or beliefs of any person or persons, and that, having decided that such diversions should be among the physical exercises to be practiced in such schools, such decision involved a conclusive determination by the board authorized to find upon and decide the proposition that dancing was not obnoxious to the objection that it was offensive to or in contravention of the religious beliefs or the "conscientious scruples" of any person or set of persons. The argument is, in some respects, unique, and in our judgment is wholly fallacious.

There is no subject as to which the sovereign power of a state may be exercised of greater importance than that of the matter of education. Indeed, of such overruling concern to society and government is the matter of education regarded that in this state, and, we may safely assume, in every other state of the American Union, there has been placed upon the statute books a law (Stats. 1919, p. 407), the violation of which by the parent or guardian of any child is attended by severe penal punishment, requiring children between the ages of 8 and 16 years, save in certain exceptional cases specified in the statute, to attend the public schools. As is well said in the case of *State ex rel. Kelley* v. *Ferguson,* 95 Neb. 63, 73 [50 L. R. A. (N. S.) 266, 273, 144 N. W. 1039, 1043]: "Wherever education is most general, there life and property are the most safe, and the civilization of the highest order. The public school is one of the main bulwarks of our nation."

Again, in *State* v. *Clottu,* 33 Ind. 409, 411, it is said: "The matter of education is deemed a legitimate function of the state, and with us is imposed upon the legislature as a duty by imperative provisions of the constitution. . . . The subject has always been regarded as within the purview of legislative authority. How far this interference should extend is a question, not of constitutional power for the courts, but of expediency and propriety, which it is the sole province of the legislature to determine. The judiciary

has no authority to interfere with this exercise of legislative judgment; and to do so would be to invade the province which by the constitution is assigned exclusively to the law-making power.''

To the end that the public school system may in full measure function according to its purposes, there must, of course, be rules and regulations for the government thereof, and these the legislature has either directly provided or has vested the school authorities with plenary power to establish and, quite naturally and with eminent propriety, has committed to said authorities the right and power to prescribe the courses of study to be followed in the various grades of the system and to maintain at all times the discipline indispensably necessary to the successful prosecution of the high purposes thereof. To all such regulations, if they be reasonable or not violative of any of their fundamental rights, or those of their parents or guardians, the pupils are bound to conform or suffer a denial of the right to attend the public schools. Section 1684 of the Political Code expressly so provides, although it is not to be doubted that such a rule could be invoked and enforced in the absence of direct legislative authority therefor under the general power of the school authorities to maintain the system according to the design or purpose thereof.

It is also a proposition upon which there cannot exist any ground for legitimate controversy that, superadded to the mental training afforded by the public schools and public universities, there should be maintained a system of physical education or training or such training in the nature of physical exercises as will develop bodily and organic vigor in the pupils as an essential aid to the full development of their mentalities according to the instruction in the courses of studies prescribed. It is only the assertion of a palpable truism to say that nothing will go further toward stimulating mental activity and accomplishment than a healthy, vigorous physical organization, and, on the other hand, nothing can go further toward producing mental inertia than the sluggishness of the machinery of the human body or any of the vital parts thereof, often brought on by an improper treatment and care or lack of proper treatment and care of the bodily structure. This obvious proposition has been expressly recognized by the legislature in section 2

of an act passed in the year 1917 (Stats. 1917, p. 1176), entitled "An act to provide for the organization and supervision of courses in physical education in the elementary, secondary and normal schools of the state." Said section reads as follows:

"The aims and purposes of the courses of physical education established under the provisions of this act shall be as follows: (1) To develop organic vigor, provide neuro-muscular training, promote bodily and mental poise, correct postural defects, secure the more advanced forms of co-ordination, strength and endurance, and to promote such desirable moral and social qualities as appreciation of the value of co-operation, self-subordination and obedience to authority, and higher ideals, courage and wholesome interest in truly recreational activities; (2) to promote a hygienic school and home life, secure scientific supervision of the sanitation of school buildings, playgrounds and atheltic fields, and the equipment thereof."

It is upon the general authority vested by the foregoing section in the school authorities that dancing has been introduced in some of the public schools of the state as a part of the physical education taught and practiced therein. It will be observed that the section does not pretend to describe specifically the nature or the character of the various physical exercises which shall constitute the system of physical education which may be so maintained. Dancing is not so mentioned as a part of such education or the exercises comprehended within such education.

Replying first to one of the arguments advanced by counsel for the respondents, we remark that the contention that the enactment or adoption of a certain law or regulation or rule by the legislature or a board or body to which certain powers may be committed is a conclusive determination of the reasonableness of such law or regulation or rule is not wholly tenable. In other words, there is a well-recognized qualification to the rule that a determination by the legislature or a local board or body of the facts upon which an act or rule or regulation, coming within the scope of the general powers of the legislature or such board or body, is essentially founded, is conclusive upon the courts. [1] The courts have the right to look into a public law or a local ordinance or regulation for the purpose of determining

whether, upon its face, it is reasonable or in its operation
will be unreasonably burdensome upon the body of citizens
to which it may be applicable, and if it is found to be op-
pressive in its effect when put in operation or violative
of any of the fundamental rights of any person or set of
persons, it will and should be nullified by judicial fiat as
unconstitutional and void, notwithstanding that the legisla-
ture or the governing board enacting or adopting such law
or ordinance or regulation has passed upon the facts upon
which the law or ordinance or regulation is based and
made a determination that it is reasonable or that it will
not impose unreasonable burdens upon those who come with-
in the purview of its terms. But the question which we
are here called upon to decide is not whether it is within
the scope of the legal power of the school authorities to
include within the course of physical education carried on
in the public schools the character of dancing mentioned
in the complaint. Indeed, we will not subscribe to the prop-
osition that such dancing may not properly be embraced
within the curriculum of that branch of the public school
service. The question here, however, is whether the children
of persons conscientiously opposed, from religious convic-
tions or otherwise, to dancing in any form, may be com-
pelled, on pain of expulsion from school and of the denial
of the right to attend any public school of the county, to
participate in the dancing exercises as they are practiced
in the school of which the respondents are trustees and as
described in the complaint.

[2] The whole theory of the argument of the respond-
ents seems to be that the question presented here is one of
religion, and that, to state a ground for relief in this pro-
ceeding, it was requisite for the appellant to have set
forth in his complaint the fact, if it be a fact, that he is a
member of a religious organization which is opposed to
dancing. In other words, it seems to be conceded, or sub-
stantially so, that to require pupils who are the children of
persons affiliated with a religious organization which is op-
posed to dancing to indulge in that exercise in the public
schools, on pain of expulsion therefrom, would involve an
abridgment of the constitutional rights of such parents and
such pupils. Indeed, assuming that the question to be de-
cided here is solely one of religion, in our opinion no other

conclusion could justly be arrived at in the face of the mandate of the federal constitution providing that ''Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof'' (Amendment No. 1) and the positive pronouncement of our own state constitution (art. I, sec. 4), providing: ''The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this state; and no person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.''

These constitutional guaranties invest every citizen of this country with the right to worship Almighty God according to the dictates of his own conscience, free from molestation or interference by the legislature or any other power in the government, so long as such worship is not offensive to the common sentiments of civilized mankind or is not against the public peace and good order. There are, it is known, certain doctrinal propositions upon which religious organizations differ; but it never has been and never will be doubted, so long as our constitutions contain the provisions relative to the freedom of religious worship that are now therein contained, that any doctrine or principle which it is conceived by any religious organization will the more effectually promote the paramount purpose of such organization, to wit, the development of the religious and spiritual growth of the people, so long as such doctrine or principle is not offensive to our laws or our civilization or will not tend to disrupt the peace and safety of our society or governments, such organization will be protected by the laws of the country in the maintenance of such doctrine or principle. In other words, there will not be permitted to exist in the state any power the execution of which would in any way impair or destroy the right of such organization to practice such doctrine or principle and teach it to the world as an essential of a proper worship of the Creator. The reports, both federal and state, are replete with opinions of the higher courts clearly and forcefully sustaining this position. Indeed, the proposition thus declared is so well settled and so

54 Cal. App.—45

generally accepted as a part of the law of the land that the authorities referred to need not be named herein.

But the principles above stated are not alone applicable to religious organizations or to persons actively affiliated with such organizations. They apply as well to any person having religious convictions irrespective of whether he is a member of any church or other religious society. Manifestly, a person may have religious views or principles of his own, different, perhaps, on doctrinal matters, from those of any church organization or any other person. He may have a way, peculiar to himself, of worshiping the Supreme Being, and there is no logical ground for holding that in thus worshiping his Maker, he is not equally entitled with every other person or church society to the protection of the constitutional guaranties to which we have above adverted, assuming, of course, that his mode of worshiping is not offensive or detrimental to the peace and safety of society. In this connection we may call attention to the argument of counsel for the respondents, as if a fatal defect in the complaint was thus pointed out, that, so far as it appears from that pleading, the "religious principles" of the appellant may be personal to himself. A man's religion is always "personal to himself," whether he be a member of a church or not. Whom could a man's religion concern but himself? True, if a member of a church organization, he will, of course, as he should, endeavor, in the very best way of which he is capable, to spread and disseminate the principles of the religion of which he is a devotee and so assist in upbuilding and fortifying the spiritual standard of the world; yet, in the last analysis, his religion is his and is, of course, personal to himself, as it is to every other person who professes it.

The question involved in this controversy, however, is not necessarily one of religion or whether the dances mentioned in the complaint and to which the appellant is opposed are disapproved of by the religious organization to which he belongs, if, indeed, he is a member of any such organization. It is as much a question of morals, which may concern the consciences of those who are not affiliated with any particular religious sect as well as of those who are active members of religious organizations opposed to that form of amusement or exercise.

The writer of this opinion has no prejudice or holds no feeling of hostility against any form of dancing where the same is conducted with becoming propriety, and particularly has he none against what is known as "folk-dances"—the old style of dancing which has from time immemorial been common among the people generally (such as the "quadrille," or "cotillion," the "Virginia reel," etc.), and there are many others who see no wrong in dancing where the same is properly conducted under proper circumstances. But that such performances, particularly among the younger people—those of immature judgment—where the same are indiscriminately indulged in between males and females are regarded, as we know from common knowledge, by a considerable proportion of the people as tending in no small degree to develop in the young thoughts or propensities incompatible with that higher concept of morality which is a prime desideratum of life and which should be first among the teachings of all public or private institutions having more or less to do with the molding of human character, cannot for a moment be doubted.   Or, it may be that, while not regarding dancing as wrong *per se,* or as not necessarily tending to generate in the minds of the young indulging therein the germs of immorality, many persons, nevertheless, perceive in the amusement or the exercise, as it may be properly called when viewed as a part of the physical education taught in the schools, an element of infatuation so overruling in its effect upon the undeveloped judgment of minors as to distract their minds, to their irremediable detriment, from the more important and serious matters or affairs of both spiritual and temporal concern.   These are considerations which may address themselves as well to the minds or consciences of those not connected with any church or other religious society as to the minds and consciences of those who are affiliated with such organizations; for unquestionably there are very many people, not professed worshipers of the Creator according to the doctrines, tenets, and canons of the churches, or not members of any religious sect or organization at all, who are citizens of the highest character, lead exemplary lives and believe strictly in righteousness; who, indeed, shape their lives and acquit themselves in all their temporal activities as nearly in accord with the mandate of the Golden Rule as the handicaps of

human limitations will permit, and who, in obedience to
their principles, entertain conscientious opposition to danc-
ing under any circumstances.    Indeed, there may be persons
(and undoubtedly there are many) who have absolutely no
religious convictions whatever based upon the teachings of
the Good Book—in fact, even atheists and agnostics—who
are conscientiously opposed to their children engaging in
dancing in any form or under any circumstances upon the
honest belief that such performances are not conducive to
the moral uplift of the young.    The proposition here may
well be said to be something similar to that of the introduc-
tion of card-playing in the public schools as a mental exer-
cise, assuming that such a course should be pursued.    There
are many games at cards, in the proper or skillful playing
of which there is required accurate or very correct think-
ing, and it is known that in the playing of such games
those who are superior in thinking power or capacity are
those who can play such games the most skillfully and suc-
cessfully.    Games at cards are not in and of themselves
harmful where they are not played for money or other
stakes.    They are common in the homes and are indulged
in by people of the very highest character and of the most
perfect ideals, yet nothing would appal the people more
than to be told that such games had been introduced into
the public schools as part of their system of mental train-
ing or for the purpose of developing the power for thinking
in the pupils.    Indeed, such an announcement would im-
mediately bring forth widespread and emphatic remon-
strances against such an innovation—not because the people
regard such a practice as being harmful *per se,* but because
of the evil results which might and which common experi-
ence has shown often do flow therefrom, and these remon-
strances would be the outgrowth, as is true of plaintiff's op-
position to dancing as practiced in the Fruitridge school,
of the conscientious belief that such a practice might tend
to the degradation of the moral standard of the pupils.

    [9]    Thus it will be readily understood that, as before
declared, the important proposition involved in this contro-
versy is no more a question of religious liberty than it is a
question of morals and the liberty of conscience upon a
subject upon which people have the natural and the con-
stitutional right to hold and put into practice divergent

opinions. In truth, the proposition even extends beyond the question of the ultimate effect of dancing exercises upon minor children. It also involves the right of parents to control their own children—to require them to live up to the teachings and the principles which are inculcated in them at home under the parental authority and according to what the parents themselves may conceive will be the course of conduct in all matters which will the better and more surely subserve the present and future welfare of their children. Can it be true that a law which vests in others the authority to teach and compel children to engage in those acts which their parents, upon what they regard as a well-founded theory, have conceived that it is not conducive to their personal welfare to adopt and follow, have specially and strictly enjoined them not to engage in, is a valid enactment? Has the state the right to enact a law or confer upon any public authorities a power 'the effect of which would be to alienate in a measure the children from parental authority? May the parents thus be eliminated in any measure from consideration in the matter of the discipline and education of their children along lines looking to the building up of the personal character and the advancement of the personal welfare of the latter? These questions, of course, proceed upon the assumption that the views of parents affecting the education and disciplining of their children are reasonable, relate to matters in the rearing and education of their children as to which their voice and choice should first be heeded and not offensive to the moral well-being of the children or inconsistent with the best interests of society; and to answer said questions in the affirmative would be to give sanction to a power over home life that might result in denying to parents their natural as well as their constitutional right to govern or control, within the scope of just parental authority, their own progeny. Indeed, it would be distinctly revolutionary and possibly subversive of that home life so essential to the safety and security of society and the government which regulates it, the very opposite effect of what the public school system is designed to accomplish, to hold that any such overreaching power existed in the state or any of its agencies.

[4] Addressing ourselves now particularly to the present case, it is first to be observed that the appellant does not voice any objection to the practicing of the dances described in the complaint in the school from which his children were expelled. And, we may add, as we have above intimated, such an objection would be wholly unreasonable and untenable. He merely objects to his children being coerced by the school authorities into taking part in those exercises contrary to the teachings they have received from their parents upon that subject; and the fact that he asks that his children be excused from participating in those dances is not unreasonable. We cannot perceive wherein the granting of his wishes in that particular can tend in any degree to interfere with the established discipline of the school. As there is not (and perhaps never will be) a general objection by parents or the public to that mode of physical education, the practice of dancing may be carried on and those not hostile to it for religious or other sufficient reasons may avail themselves of that method of developing bodily vigor; and for those objecting to dancing for substantial, but not merely capricious, reasons—indeed, such an objection as is bottomed by reasons prompting the appellant's opposition to dancing—there are other physical exercises which may be adopted which will as effectually "develop organic vigor, provide neuro-muscular training, promote bodily and mental poise, and correct postural defects," etc., as will the kind of dancing that is, according to the complaint, included within the system of physical education which has been adopted and is habitually practiced in the school in question. There are the calisthenics and other athletics embracing a variety of physical exercises to which no reasonable opposition on moral or religious or other grounds can be urged. Then there is the military training which, if practiced, cannot but result, not only in developing bodily vigor and "bodily and mental poise" in those participating therein, but also in inculcating in some measure at least in the youths of the country sentiments of patriotism and thus educating them along lines which may be of great practical use and of infinite advantage to them and their country at some future time. These observations are suggested, not in a spirit of dictation to the school authorities as to what method or system of physical education shall

be introduced in our public schools as a part of the system, but are offered only for the purpose of showing that the school authorities, in the management of the public schools, need not be seriously or at all embarrassed or the discipline of the school disturbed by the fact that there may be some pupils who, for reasons whose source is in the conscience, may not be permitted by their parents to take part in the dancing exercises as they are taught as a part of the physical education of the public schools.

The views expressed in this opinion are sustained by many authorities. We do not deem it necessary to name them all herein. The whole subject is exhaustively and admirably considered and many authorities reviewed in the case of State ex rel. Kelley v. Ferguson, 95 Neb. 63 [50 L. R. A. (N. S.) 266, 144 N. W. 1039], supra. See, also, Mr. Justice Field's discussion of the subject in Davis v. Beason, 133 U. S. 333 [33 L. Ed. 637, 640, 10 Sup. Ct. Rep. 299, see, also, Rose's U. S. Notes].

But the district attorney undertakes to establish an analogy between the proposition involved in this discussion and the circumstance, which occurred a few weeks ago in Solano County and which was reported in the daily press, of the expulsion of children of a certain citizen of said county from one of the public schools thereof because they refused to salute the flag of the country. The ground of the objection of the parent to the practice of saluting the flag in the public schools was that it was against his Bible teaching that it is wrong to teach patriotism for the reason that such teaching leads to militarism. There is obviously no force to such objection. It is indeed repugnant to every idea and every consideration of the loyalty and love for our government and political institutions so essential to the maintenance thereof. No government could long survive in the absence of patriotism in the people living under it, and one of the first or primary duties not only of the public schools but of every other educational institution in this country is to inculcate in those who attend them the principles of patriotism. The flag of our country symbolizes the principles of our government, and we can conceive of no more appropriate act or practice which could be followed in our public schools, or which could go further in developing in the young a high order of citizenship, than the require-

ment that the pupils thereof shall at every session of said school salute our flag or otherwise give some demonstration of their love for the great principles which it represents. And we can conceive of no just or reasonable interpretation of the Bible, or any part thereof, which could, in the remotest way, inspire the thought that the teaching of patriotism or love of country is in anywise or in any degree or measure contrary to its teachings.

The counsel for the respondents further undertakes to establish a distinction between the dancing which is described in the complaint and what he conceives to be "modern dancing," claiming that the latter or "up-to-date dancing" is the only character of dancing to which the churches that are opposed to dancing seriously object. In other words, it is claimed that there never has been any objection by the churches to so-called "folk-dancing," because the method of its performance is not in any sense offensive and is entirely different from the modern method of performing that exercise. There is obviously no ground for any such a distinction, in so far as is involved the effect of that amusement, when exercised in the form as described in the complaint, upon those of the young who engage therein. Indeed, the dances referred to in the complaint are not strictly the "folk-dances" which were in common vogue thirty or even twenty years ago. The complaint, as we have seen, specifically describes the dances which are taught and practiced in the school in question as the "waltz" step, the "polka" step, the "two-step," and a dance that is "equal" or similar to the "fox-trot." The "waltz," the "polka," and the "fox-trot" are popularly known as "round dances," or where (as we know from common knowledge) the dancing is performed in couples, usually by a male and a female, their arms clasped around or about the shoulders of each other and the couple thus together or synchronously moving over and around the dancing-floor, and, as the Century dictionary describes it, performing "a series of cadenced steps and rhythmic movements." Thus it is very clear that the dances referred to in the complaint are no different, so far as the general method of executing them is concerned, from what are known as "up-to-date" dances. Indeed, the dances de-

scribed in the complaint were included within the amusement of that character which was common among the people down to the time that so-called modern dances were introduced, and there has always been more or less opposition from religious as well as some nonreligious people against that form of amusement. In fact, the opposition of certain churches and the members thereof to dancing has always been so pronounced that it would, a half a century ago, have come as a shock, even to those of perverted notions of morality, if it had been announced that the dancing referred to in the complaint had then been introduced into the public schools as a part of the physical instruction therein.

The complaint further alleges, as will be noted, that, in the performance of the dances mentioned therein in the school in question, the "girls have boys as partners at times, and when boys are not available girls are designated to represent boys so as to form couples." It is also alleged that the dancing as so executed in said school is offensive to the conscientious scruples and contrary to the religious beliefs and principles of the children of the appellant as well as of himself and his wife. These averments, together with the description contained in the complaint of the character of dancing practiced in the school in question, sufficiently make out a case for the relief demanded to enable the respondents to reply thereto as specifically as the exigency of their defense may require.

The district attorney expresses the fear, however, that should the plaintiff take the witness-stand and in support of his complaint state that he was, as a matter of religion or otherwise, conscientiously opposed to dancing, the respondents would find themselves in a position where they could not controvert that testimony. Manifestly, that proposition does not enter into the question whether the complaint does or does not state a cause for the relief sought thereby. But we can see no reason for any serious apprehension on the part of the district attorney in that particular. There is no reason why the testimony of the appellant could not be contradicted. If such evidence is available to the respondents, the district attorney could show that the appellant had permitted his children to dance on public

occasions or at home, or that he himself engaged in such amusement; and this would tend to show that his acts were at variance with his protest against dancing as he states it in the complaint.

We have examined the question submitted here at length because of its singular importance, and after such examination have been irresistibly forced to the conclusion, as is manifest from the above discussion, that the complaint, the truth of the averments of which is admitted by the demurrer, is in all respects sufficient to warrant the granting of the relief prayed for.

Accordingly, the judgment is reversed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1921, and the following opinion then rendered thereon:

THE COURT.—[5] In denying the petition for a transfer to this court, we deem it proper to say that we concur in the conclusion of the district court of appeal that the respondents had no right to expel petitioner's children for their refusal, in obedience to their parents' command, to dance the waltz, polka, two-step, or a dance similar to the fox-trot, or any other dance wherein the children were required to dance with partners of the opposite sex with their arms clasped around or about the shoulders of their dance partner. In the petition for a transfer to this court the district attorney contends that the district court of appeal has misconstrued the allegations of the petition and that the petition, fairly construed, does not charge that the respondents required petitioner's children to engage in the form of dancing condemned by the district court of appeal.

We agree with the district court of appeal as to the interpretation of the petition. If issue is made by answer upon the facts alleged in the petition, the trial court can determine the true facts and render judgment accordingly. As we understand the opinion of the district court of appeal, it goes no further than to hold that the character of

dancing above mentioned cannot properly be required of children whose parents object thereto.

Petition denied.

Wilbur, J., Lennon, J., Sloane, J., Shurtleff, J., Richards, J., *pro tem.*, Waste, J., and Shaw, C. J., concurred.