**Liisa M. DAVIS, a minor, et al.**

**v.**

**William C. PAGE, Individually and as Superintendent of Schools for New Hampshire Supervisory Union Number 47, et al.**

**Civ. A. No. 74–51.**

United States District Court,
D. New Hampshire.

Nov. 27, 1974.

Charles G. Douglas, III, Perkins, Douglas & Brock, Concord, N. H., for plaintiffs.

Maurice M. Blodgett, Blodgett & Makechnie, Peterborough, N. H., for defendants.

## OPINION

BOWNES, District Judge.

This is a civil rights action brought pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983. It is not a class action.

Plaintiffs Liisa M. Davis and Eric L. Davis are brother and sister. The action is brought on their behalf by their father, Harold Gene Davis. Judy Davis, mother of the children, was the chief witness. The children and their parents will be treated as plaintiffs for reasons explained later. The defendants are William C. Page, Superintendent of Schools for New Hampshire Supervisory Union Number 47; Richard Sawyer, Principal of Jaffrey-Rindge Middle School; John Cornellia, Principal of Rindge Memorial School; and the members of the Jaffrey-Rindge School Board. All parties are citizens of New Hampshire.

Plaintiffs are members of the Apostolic Lutheran faith. They allege that the School Board's policy, which requires that students remain in the same classroom where religiously offensive activities are taking place as part of the school program, violates their rights guaranteed by the First Amendment and the parents' inherent right to control the moral and religious development of their children.

## THE FACTS

The Apostolic Lutherans comprise a sizeable minority of the student population in the Jaffrey-Rindge School District. Superintendent Page testified that twenty percent of the Jaffrey-Rindge students are members of the Apostolic Lutheran faith. At trial, plaintiffs introduced evidence which demonstrated deep and pervasive religious objections to the manner and mode in which the educational process is conducted within the Rindge School District. Plaintiffs have introduced evidence that the dogma of their faith makes it sinful for them to: watch movies, watch television, view audio-visual projections, listen to the radio, engage in play acting, sing or dance to wordly music,[1] study evolution, study "humanist" philosophy,[2] partake in sexually oriented teaching programs, openly discuss personal and family matters, and receive the advice of secular guidance counselors.

Up until the school year ending in June, 1971, Rindge School Board policy allowed any student who voiced religious objections to classroom activities to leave the room. Due to the sizeable number of students who objected and its attendant disciplinary problems, after numerous public meetings, the School Board adopted a different policy in August of 1971. Under the newly promulgated policy, students are not allowed to leave the classroom if the activities offend their religious beliefs. Despite their religious objections, students are now required to remain in the classroom with the option of placing their heads on the desk, turning their chairs away, or standing in the back of the classroom. Since the Apostolic Lutherans object to the sound, as well as the picture, projected by audio-visual devices, plaintiffs found the alternatives to be unacceptable.

After adoption of the new policy, tension increased between plaintiffs and the School Board. Plaintiff Eric Davis testified that, on one occasion, he was physically forced to watch a film. The irremedial breakdown between the parties occurred when Eric left the classroom in which a movie was being shown, without either the knowledge or permission of the teacher, and returned home. His father, noting his early arrival home, asked why he was not in school. When Eric informed him that he had been forced to watch a movie, Mr. Davis went to the school and became engaged in a heated discussion with the Principal of the School, Mr. Bramblett. In June of 1973, the Davises withdrew their children from the Rindge Memorial School and sought private tutors.[3]

The Davises specifically object to the following School Board policies: (1) refusing to allow their children to withdraw from classrooms where audio-visual equipment is being used; (2) mandatory attendance that is to be required for a prospective course entitled "Health and Education"; and (3) requiring children to attend music classes.

Plaintiffs do not seek to enjoin the teaching of these courses nor enjoin the classroom use of any audio-visual equipment. The gravamen of the complaint is that the School Board's policy of requiring the children to be physically

---

1. None of the plaintiffs' witnesses could describe what constituted "worldly" music. Instead, they transposed Justice Stewart's definition of obscenity and testified that they knew it when they heard it.

2. Webster's New International Dictionary (2d ed. 1947) defines humanism as "[a] system, mode, or attitude of thought or action centering upon distinctively human interests or ideals, esp. as contrasted with naturalistic or religious interests. To replace the conception of man as the subject of a heavenly king . . . humanism takes as its dominant pattern from the progress of the individual from helpless infancy to self-governing maturity."

3. As a result of the withdrawal of their children from public school and their failure to enroll the children in a private school, the parents are facing possible criminal prosecution. NH RSA 193:1 and 193:2 and NH RSA 193:7 (1973 Supp.). *See also* In re Eric and Lisa Davis, 114 N.H. 242, 318 A.2d 151 (1974).

present in a classroom where religiously offensive activities are taking place violates their constitutional guarantees. The Davises seek an order from this court which will require school officials to excuse their children from a classroom whenever nonsectarian activities conflict with their religious tenets.

■ The interests of the children are not co-terminous with that of their parents. The children have conflicting interests. There is no doubt that, as children, they have constitutionally protected rights. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); In re Gault, 387 U.S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

The Davis children, unlike the children in Wisconsin v. Yoder, 406 U.S. 205, 207, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and Tinker, *supra*, 393 U.S. at 504, 89 S.Ct. 733, are elementary school students. Based on the demeanor and testimony of Eric Davis, I find it difficult to believe that he understands the ramifications of his religious beliefs. His sister did not testify. It would be naive for this court not to recognize that the children's asserted freedom of exercise of religion is, in essence, that of their parents. In fact, the freedom asserted is the right of the parents to inculcate and mold their children's religious beliefs to conform to their own without the children being subjected to school programs and materials which the parents deem offensive and subversive of these beliefs. Galanter, Religious Freedoms in the United States: A Turning Point?, 1966 Wisc.L.Rev. 217, 285. The children's rights and interests are not limited to those which their parents assert—their rights and interests also cut the other way. As Justice Douglas has stated:

> If a parent keeps his child out of school beyond the grade school, then the child will be forever barred from entry into the new and amazing world of diversity that we have today. The child may decide that that is the preferred course, or he may rebel. It is the student's judgment, not his parents', that is essential if we are to give full meaning to what we have said about the Bill of Rights and of the right of students to be masters of their own destiny. If he is harnessed to the Amish way of life by those in authority over him and if his education is truncated, his entire life may be stunted and deformed. *Yoder, supra,* 406 U.S. at 245–246, 92 S.Ct. at 1548 (Douglas, J., dissenting).

The real party in interest here is the parents. Both the children and the parents claim that the School Board's policy violates their First Amendment guarantee to the free exercise of their religion. Although I treat both the parents' and children's First Amendment claims together, this does not mean that the interests of the children are synonymous with their parents'.

The basic issue is whether elementary students must be excused from a classroom where nonsectarian educational exercises are taking place whenever it is alleged that such exercises violate their parents' religious beliefs.

## THE LAW

The Davises allege that the School Board's policy violates two constitutional guarantees: the First Amendment guarantee of freedom of religion and their fundamental right to control the upbringing of their children.

They claim that the tenets of their religion make them responsible for the moral and spiritual development of their children and that the spiritual neglect of the children will result in the parents' eternal damnation. Exhibit 4. Closely interlinked with this First Amendment claim is the allegation that the School Board's policy infringes upon the parents' inherent right to control the religious upbringing of their children. *Yoder, supra,* 406 U.S. at 214, 92 S.Ct.

1526; Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); State v. Jackson, 71 N.H. 552, 556, 53 A. 1021 (1902). Justice White stated in Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L. Ed. 551 (1972):

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399, [43 S.Ct. 625, 67 L.Ed. 1042] (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 86 L.Ed. 1655] (1942), and "[r]ights far more precious . . . than property rights," May v. Anderson, 345 U.S. 528, 533 [73 S. Ct. 840, 97 L.Ed. 1221] (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166 [64 S.Ct. 438, 88 L.Ed. 645] (1944).

Although the two rights are separate and distinct, they invoke the same standard of review and will be viewed conjunctively. Although the language of many cases indicates that the appropriate standard of review is the compelling state interest test,[4] the Supreme Court has signaled a departure from its application in cases of this type. In Yoder, supra, 406 U.S. at 214, 92 S.Ct. at 1532, the Court stated:

> a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment,

and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of Pierce, "prepare [the children] for additional obligations." 268 U.S. at 535, 45 S.Ct. at 573.

■ The balance is a most precarious one. The parents' right to freely exercise their religion and their inherent right to control the upbringing of their children must be weighed against the state's interest in providing its youth with a proper and enabling education and the children's right to receive it.

The first issue is whether the School Board's policy, which requires students to remain in the classroom where audiovisual equipment is used, violates the parents' constitutional guarantees. I define audio-visual equipment as any material designed to aid in the children's learning and teaching by making use of both hearing and sight. This includes, but is not limited to, overhead projectors, film strips, television, radio, 8 mm movies, and 16 mm movies.

The interests asserted by the parents are clear. They have a legal, moral, and religious responsibility to protect and maintain the health, welfare, and safety of their children. Pierce, supra, 268 U. S. at 534–535, 45 S.Ct. 571. The parents also want their children to follow their religious beliefs. Parents teach and instill in their children, from the earliest age, the religion that they believe will sustain and nurture them during life's struggles.

The School Board's policy directly burdens this right, for it allows to be done in the school what is prohibited at home. It places the children between the Scylla of obeying their parents' religious teachings and the Charybdis of obeying the commands of their teachers and school authorities. The tension pro-

---

4. In Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court stated:

> We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringe-

ment of appellant's First Amendment right.

Numerous cases have used the same standard of review. Neal v. State of Georgia, 469 F. 2d 446 (5th Cir. 1972); Spence v. Bailey, 465 F.2d 797 (6th Cir. 1972); Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971).

duced by this conflict cannot help but reduce the parents' effectiveness in directing the religious upbringing of their children and the School Board's effectiveness in providing the children with a proper education.

The state's interests are also clearly defined. Like the parent, the state has important and vital interests at stake. In New Hampshire, public elementary and secondary education is a specific constitutional right. Vail v. Board of Education of Portsmouth School Dist., 354 F.Supp. 592, 602 (D.N.H.1973). Coupled with the state's interest in a well educated citizenry is the child's interest in receiving an education. Chief Justice Warren stated in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954):

> In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.[5]

It is the purpose and goal of the public school system to prepare and educate the youth so that they will

> be able to earn an adequate livelihood, to enjoy life to the fullest, or to fulfill as completely as possible the duties and responsibilities of good citizens. Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (5th Cir.), cert. denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

In order to advance these purposes, the School Board has been given a statutory duty to provide an education to "all pupils under eighteen years of age . . . ." NH RSA 189:1–a (1973 Supp.).

Attempts to restrict the scope of the educational process have been met with judicial hostility. Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed. 2d 228 (1968); Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L. Ed. 646 (1927); *Meyer, supra;* Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67

L.Ed. 1047 (1923). The First Amendment does not mandate nor does it "tolerate laws that cast a pall of orthodoxy over the classroom." *Epperson, supra,* 393 U.S. at 105, 89 S.Ct. at 270. The source of this hostility is the recognized objective of exposing our youth to a broad educational spectrum, creating a culturally pluralistic society, where general knowledge is the right of all and not the privilege of a few. In balancing the interests of both parent and state, this court keeps in mind Justice Fortas' warning in *Epperson, supra,* 393 U.S. at 104, 89 S.Ct. at 270:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . . By and large, public education in our Nation is committed to the control of state and local authorities.

I find that in weighing the rights and interests of the parties, with regard to audio-visual equipment, that the balance tips in favor of the state.

Audio-visual equipment is used in the teaching of nearly every school subject from arithmetic to zoology. I take judicial notice that audio-visual techniques are favored by educators and that they are an intregal part of the educational process. As presented in this case, they are nonsectarian in purpose and manner.

■ Parents have no constitutional right to deny their children an education. Commonwealth v. Bey, 166 Pa.Super. 136, 70 A.2d 693 (1950). Unlike *Yoder,* the parents here have introduced no evidence that they are preparing their children for an existence in an isolated and independent community. In fact, Mr. Davis is employed as a truck driver. His occupation places him in the mainstream of the economic system. His children will one day seek employment in the public sector and they will find that a basic education is essential when seeking gainful employment.

5. *Cf.* San Antonio School District v. Rodriguez, 411 U.S. 1, 33–35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), where the Court found that there was not a fundamental right to education.

Even in *Yoder,* the Amish allowed their children to attend public school up to the eighth grade.

If these children are allowed to leave the classroom whenever audio-visual equipment is being used, then they will be denied an effective education. The Constitution does not command such a result. A parent, because of his own religious preferences, is not allowed to make martyrs out of his children. Prince v. Massachusetts, 321 U.S. 158, 61 S.Ct. 438 (1944); Application of President and Directors of Georgetown, Col., 118 U.S.App.D.C. 80, 331 F.2d 1000, cert. denied 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 1746 (1964). As was stated in *Yoder, supra,* 406 U.S. at 233–234, 92 S.Ct. at 1542:

> [t]o be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

It is difficult to determine how vital a role audio-visual equipment plays in the education of the children. According to the testimony, it is used in practically every course and is considered to be a superior teaching technique. To allow children to leave the classroom every time the equipment is used might not cripple their education, but it would certainly have an adverse effect upon it.

■■ The next step is to determine whether the School Board's policy is constitutionally tailored to the state's vital interests. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The School Board's policy will be held constitutionally impermissible if there is an available alternative which lessens the burden on parents' constitutional rights, without undermining the state's interests. Sherbert v. Verner, 374 U.S. 398, 408–409, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). I find that there is no reasonable alternative to the use of

audio-visual equipment and that the children may not be excused from a classroom where such devices are used. In order to lessen the burden on the parents' free exercise of their religion, the state would have to provide separate courses of instruction for their children. The First Amendment does not command such a result. *Braunfeld, supra,* 366 U.S. at 608–609, 81 S.Ct. 1144; Gray v. Gulf, Mobile and Ohio Railroad Company, 429 F.2d 1064, 1072 (5th Cir. 1970), cert. denied 400 U.S. 1001, 91 S. Ct. 461, 27 L.Ed.2d 451 (1971). In fact, requiring the state to provide the children with a separate education conflicts with the Establishment Clause of the First Amendment. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

There are, however, situations when audio-visual equipment may be used for entertainment purposes rather than educational purposes. When audio-visuals are used to entertain rather than to educate, the vitality of the state's interests diminishes. In this situation, the parents' interests become predominant and the children cannot be required to remain in the classroom. I recognize that the line between education and entertainment, especially at the elementary school level, may at times be fine, but it is a line that has to be drawn by the school authorities.

By allowing the Davis children to be excused from participation in certain activities, the question arises whether this exception violates the Establishment Clause of the First Amendment.

In *Yoder, supra,* 406 U.S. at 220–221, 92 S.Ct. at 1536, Chief Justice Burger stated:

> The Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter how vital it may be to the protection of values promoted by the right of free exercise. By preserving doctrinal flexibility and recog-

nizing the need for a sensible and realistic application of the Religion Clauses

> "we have been able to chart a course that preserved the autonomy and freedom of religious bodies while avoiding any semblance of established religion. This is a 'tight rope' and one we have successfully traversed." Walz v. Tax Commission [397 U.S. 664, 672, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)].

■ Allowing the Davis children to be excused from participating in non-educational activities which make use of audio-visual equipment does not entangle the school with religion nor does its primary effect advance or inhibit religion. *Kurtzman, supra,* 403 U.S. at 612–613, 91 S.Ct. 2105. This limited exception does not run afoul of the Establishment Clause of the First Amendment. The wall that separates church and state remains intact. The Establishment Clause does not demand hostility to religion, only neutrality.

The second issue is whether requiring children to attend the proposed "Health Education" course violates parents' constitutional guarantees.

The health course is not now being taught, but Superintendent Page testified that it was going to be implemented into the educational program and that attendance will be required. Although the health course is not specifically required by statute,[6] it includes subjects which are required by statute. NH RSA 186:11 (1973 Supp.) provides that the School Board has the statutory duty to instruct students about the effects of drugs, alcohol, and venereal disease. At present, no specific course deals with these subjects, but their teaching is disseminated throughout the educational program. The health course would combine these subjects into a comprehensive course. The basic outline of the course provides that the following areas be covered: family relationships; mental and physical health; personal hygiene; nutrition; hazards of smoking; dangers and benefits of drugs; and environmental concern.

The parents allege that the teaching of this course violates the tenets of their religion for the following reasons: (1) it publicly examines family relationships; (2) studying the problems of overcrowding will condition their children to use and be in favor of birth control devices; and (3) the course teaches a "humanist" philosophy.

Unlike their previous objections, plaintiffs have introduced a paucity of evidence that the teaching of this course will burden their religion or its free exercise. In determining whether a person's objections are based on religious, social, political, or philosophical grounds, a judge must strive not to allow his decision to be influenced by his personal appraisal of the claimed religious belief. Circumspection and objectivity are a judicial prerequisite. United States v. Seeger, 380 U.S. 163, 184, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

This does not mean that the court is unable to inquire as to whether a person's objections are religiously motivated. Circumspection does not mandate judicial blindness. Claims which are a by-product of "subjective evaluation and rejection of the contemporary secular values accepted by the majority," being "philosophical and personal rather than religious, . . . [do] not rise to the demands of the Religion Clauses." *Yoder, supra,* 406 U.S. at 216, 92 S.Ct. at 1533.

■ Based on the evidence introduced, I find that the health course does not impinge upon the parents' freedom of religion or its free exercise. A letter

---

6. Local School Boards may provide for instruction in subjects which are not prescribed by statutes, the legislature, or the State Board of Education. Neilan v. Board of Directors, 200 Iowa 860, 205 N.W. 506 (1925); Epley v. Hall, 97 Kan. 549, 155 P. 1083 (1916); Powell v. Board of Education, 97 Ill. 375, 37 Am.Rep. 123 (1881).

which the Davises wrote to the School Board, dated August 14, 1973, is probative as to the source of their dissatisfaction with the School Board's educational program. Portions read as follows:

\* \* \* \* \* \*

2. Our schools are contributing to the Womans' Liberation Movement by making mandatory that the boys take home economics and the girls take shop. It is a well established psychological fact that boys between ages of 12 and 16, which are the ages involved, are very vulnerable to effeminate or homosexual development if certain environment is provided. One can see that if students who already have possible unknown problems in this area were placed in this atmosphere condoned and imposed by those in authority it would certainly contribute to a particular students overall destruction of masculinity. Men are the head of the family not the homemakers.

\* \* \* \* \* \*

4. Our public schools are now employing guidance counselors to act as psychiatrist for our children. If, for instance, a student is having difficulty in, say, math he is asked such questions as:

a. Does your mother drink?

b. Does your father drink?

c. How often do your mom and dad fight?

Recently it was publicly announced that every child in the district would fall into one of the diagnostic catagories [sic] and that all problens would be saught [sic] and if unable to be dealt with by the reading specialist, guidence [sic] director, or the principal, the child would be referred to the Monadnock Children's Agency for further study. It would seem that this prediction was made and denied at the April 16th Board Meeting. Bit [sic] it has materialized, hasn't it?

5. The social studies or, if you prefer, geography books which are supplied by the school district are not all American type books.

a. They do not emphasize the many important events which made America great!

1. The importance of the Declaration of Independence has dwindled to a paper signed for the benefit of early Americans. The men who brought it into existance [sic] by the Application of their signatures and the importance of its meaning have been left out.

2. The Constitution of the U.S. and the rights of free people to govern themselves today or in the past has been obliterated by socialists [sic] minded educators. These radicals brainwash our children in the name of education to downgrade the existance [sic] of a Supreme Being.

3. The greatest emphasis in these books is placed on the "United Nations" and "world peace" rather than on the United States of America.

The UN is a Godless organization, dominated by Communist ideas and our schools are aiding this growing thorn bush of "World Government" to gain more and more power by not exposing that criminal for what it really is! In fact our children are instead, indoctrinated into blind acceptance of it, without even having the true facts of its origin. As far as world peace is concerned, this cannot be more than a fantacy [sic] unless there becomes "one world government", and "one world Emperer" [sic] to head it.

4. Students are left to make up their own minds rather than to be taught an American point of view. In substance, the blind leads the blind.

The NEA or, National Education Association prints in a spring issue of their teachers magazine: "That their purpose for reorganizing the social studeies [sic] courses is to 'create a new' social work order."

\* \* \* \* \* \*

7. It has been established that the film of Human reproduction and certain obscene paintings, which were discussed at the school board meeting of July 16th are in contradiction to the standards of morality set down by the state legislature. The corrupting affects of pornography had reached such a magnitude that a law was passed in 1969, known as law 571 A & B.

At the July 16th school board meeting at Rindge, it was established that Superintendent, Raymond Edwards, upheld teaching materials of the Art teacher, Mr. Timothy Bowers, ie [sic] the obscene paintings aforementioned.

As of July 16th, the Jaffrey-Rindge school board has not seen fit to oppose the teachings of immorality in our schools. It was further stated that any teacher is encouraged to bring in any type of material he or she deems appropriate for the class to use or to view.

At the special school board meeting of August 1st the Jaffrey-Rindge school board gave no indication that they had changed their policy. Oppostion [sic] to this type of curriculum was not a subject of discussion.

1. Because of numbers 1, 3, 5, and 8 we have purchased our childrens' [sic] own textbooks to be used in school in order to protect them against an inadequate and un-American education.

2. Because of number 2, we insist that because our daughter is a girl she will just have to be treated like a girl and regardless of who else is taking home economics she will be taking it as well. our [sic] boy will take shop.

\* \* \* \* \* \*

3. Because of number 7 the educators, and the school board have proven their lack of moral judgement [sic] to decide what instructional materials are deemed appropriate for our (Davis) children to use or to view. Therefore, our children have been instructed to go to the principal's office dur-

ing the use of any material which is "against their conscience."

4. Because of number 4 we must insist that our children not see a councilor [sic] of any description or advisor, etc., without our presence.

S–Harold Gene Davis
Judith Davis

Exhibit 19.

█ The Pastor of the church which the Davises attend was unable to specify what tenets of the Apostolic Lutheran faith the health course would violate. At this juncture, the words of Justice Clark are pertinent:

"the state has no legitimate interest in protecting any or all religions from views distasteful to them . . .." Joseph Burystn, Inc. v. Wilson, 343 U. S. 495, 505, [72 S.Ct. 777, 96 L.Ed. 1098] (1952), cited in *Epperson, supra,* 393 U.S. at 107, 89 S.Ct. at 272.

Giving plaintiffs' allegations the benefit of all doubts, the most that they have shown is that they find the health course to be "distasteful." This allegation without more does not invoke the broad mantle of protection afforded by the First Amendment.

Plaintiffs also assert that their inherent right to control the upbringing of their children requires the school officials to excuse their children from the health course. The state's interests in teaching this course is clear. As structured, the health course places emphasis on the child's physical and mental health; teaching students the importance of exercise, rest, cleanliness, nutrition and vitamins. The course also explores the dangers of smoking, drugs, poisons, and environmental overcrowding. The state has a paramount and recognized duty to provide for the health, welfare, and safety of its citizens. The health course, which is secular in nature and purpose, is a proper means by which the state can discharge this duty.

The state has an interest in maintaining and sustaining a coherent and comprehensive educational program. The

responsibility for the adoption of the school curriculum is statutorily vested in the School Board. Parents, through public meetings, can voice objections and can offer suggestions to the School Board with regard to its curriculum. But the final decision as to the modes and methods of education within the School District and the courses being taught reside in the School Board. Despite parental objections, courts have been unwilling to make patchwork exceptions to the School Board's curriculum.[7] Although it might be more judicious for the School Board to make attendance voluntary, I am unable to hold that parents' interests require their children to be excused from a course which the School Board has found to be of "vital concern." Exhibit 20. This court will not substitute its judgment for the School Board's. The only available alternative would be to excuse the children from attending the entire course. Plaintiffs have not demonstrated a constitutionally significant burden which would warrant that result.

The third issue is whether requiring the children to attend music classes violates parents' constitutional guarantees.

Plaintiffs have not claimed that music, in toto, is antithetical to their religion. Instead, they have introduced evidence that there is worldly music and spiritual music—the former being objectionable.[8] No discernible standards were given by which an objective determination or distinction could be made between the two. Pastor Sikkla testified that only those who have accepted the Spirit of God can distinguish between the worldly and the spiritual. Parents, therefore, do not object to all music, but only that music which they personally deem to be "worldly." Al-

though a musical education is not indispensable to meeting the demands and responsibilities of our modern democratic technological society, music is one of the great cultural and civilizing influences of mankind. The Old Testament shows how David's harp calmed the troubled soul of King Saul.

I find that, since plaintiffs have not shown that music classes or music in the schools imposes a significant constitutional burden upon their freedom to exercise their religion or their inherent right to control the upbringing of their children, the state must prevail. Unlike audio-visual equipment, music is not *per se* religiously offensive. The conflict between parents' instructions and teachers' orders is not as acute. The Davis children are very young. It is difficult to argue or believe that they are presently aware of the distinction between worldly and spiritual music. If they can hear music with their parents, then they can hear music in the schools.

### CONCLUSION

Plaintiffs have made three direct constitutional challenges to the school curriculum in the Jaffrey-Rindge School District. The state has an interest in providing a uniform education for all its students. Considering the multitude of religions within our Nation and the wide diversity in their teachings, it is impossible for a state to provide an educational program which is totally acceptable to all religious faiths. The First Amendment does not protect all religions from nonsectarian views which are distasteful to them. To allow students and parents to pick and choose which courses they want to attend would create a stratified school structure, where division and derision would flourish. Mr.

---

7. Cross v. Trustee Walton Graded School, 129 Ky. 35, 110 S.W. 346 (1908); Samuel Benedict Memorial School v. Bradford, 111 Ga. 801, 36 S.E. 920 (1900); State, ex rel. Andrew v. Webber, 108 Ind. 31, 8 N.E. 708 (1886); Sewell v. Board of Education, 29 Ohio St. 89 (1876). *But see* Hardwick v. Board of School Trustees, 54 Cal.App. 696,

205 P. 49 (1921). *See generally*, Comment, Sex Education: The Constitutional Limits of State Compulsion, 43 So.Calif. 548 (1970).

8. *It was testified to that Beethoven was religiously offensive to the Apostolic Lutheran faith.*

Creitz, a third grade teacher in the Rindge Memorial School, testified that the children of the Apostolic Luthern faith exerted intense peer group pressure upon those students who remained in the classroom and partook in audio-visual exercises. He testified that those students who left the classroom would call the remaining students sinners. Mr. Creitz testified that this caused tremendous internal emotional conflict in the remaining students and on more than one occasion, a student came up to him crying as a result of being called a sinner. The state has a legitimate interest in preventing this stratification. Where it is found that the abridgment on plaintiffs' constitutional guarantees are the result of secular educational activity and that the only available alternative would be to preclude the children from virtually all school courses and programs, the state's interests in treating all students equally prevails.

Where fundamental claims of religious freedom and the right to direct the upbringing of children are at stake, the court must balance the interests of the state and the impediments that would flow from recognizing parents' exceptions. *Yoder, supra,* 406 U.S. at 221, 92 S.Ct. 1526. Parents' objections go to the heart of the educational process. Our system of education could not survive if parents were allowed to dictate the courses and modes of study. I reiterate the words of the New Hampshire Supreme Court:

> [T]he power of each parent to decide the question what studies the scholars should pursue, or what exercises they should perform, would be a power of disorganizing the school, and practically rendering it substantially useless. However judicious it may be to consult the wishes of parents, the disintegrating principle of parental authority to prevent all classification and destroy all system in any school, public or private, is unknown to the law. Kidder v. Chellis, 59 N.H. 473, 476 (1879).

This court is reluctant to become involved with school curriculums and educational philosophy; that duty has been statutorily vested in the School Board. The state's interests in education does not, however, mean that all other rights and interests are subordinate. After carefully weighing the interests of all parties, I find that the School Board can refuse to excuse children from: (1) classes in which audio-visual equipment is used for educational purposes; (2) the health course; and (3) musical courses. The children, however, must be excused from participating in activities which use audio-visual equipment for entertainment purposes.

In arriving at this opinion, I have considered all exhibits offered into evidence.

So ordered.