[Civ. No. 33547. First Dist., Div. Two. Aug. 28, 1975.]

CITIZENS FOR PARENTAL RIGHTS et al.,
Plaintiffs and Appellants, v.
SAN MATEO COUNTY BOARD OF EDUCATION et al.,
Defendants and Respondents.

**4**

COUNSEL

Zang, Friedman & Damir and Robert M. Damir for Plaintiffs and Appellants.

Charles E. Rice as Amicus Curiae on behalf of Plaintiffs and Appellants.

Keith C. Sorenson, District Attorney, Jerome F. Coleman and George F. Camerlengo, Deputy District Attorneys, for Defendants and Respondents.

OPINION

**TAYLOR, P. J.**—This is an appeal by Citizens for Parental Rights, et al. (an unincorporated association of parents and as individual parents, hereafter parents), from a judgment of dismissal entered to their seventh amended class action complaint for declaratory and injunctive relief.

The basic substantive question is whether the implementation of family life and sex education programs by the five respondent school districts in the jurisdiction of respondent, San Mateo County[1] violates the constitutional rights of the individual parents and their children under the First, Ninth, Tenth and Fourteenth Amendments of the United States Constitution, and the parallel provisions of the California Constitution.[2] The case also presents a question of first impression as to the constitutionality of Education Code sections 8506 and 8701.[3] ■■ ■■■■ We have concluded that the family life and sex education programs, adoption of the resource guides, and the statutes are constitutional for the reasons set forth below, and that therefore the judgment of dismissal based on the

---

[1]Also named as respondents were the members of the county board of education who had adopted the Family Life Education Teachers' Resource Guides for all grades and encouraged their use by the districts, and the county superintendent of schools. The resource guides were "curriculum and instructional materials" pursuant to Education Code section 886, but were not required "courses of study" as then defined by Education Code section 8851 (repealed by Stats. 1968, ch. 182, § 30, p. 460). The county, however, has no power or authority to require the course or use of the materials by the districts.

[2]The pertinent provisions are: Article I, section 1: "All people are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing, and protecting property; and pursuing and obtaining safety, happiness and privacy." Privacy was added as an inalienable right by a specific amendment by the voters of this state in November 1972 and construed for the first time by our Supreme Court in *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].

Article I, section 4: "The free exercise and enjoyment of religious profession and worship, without discrimination of preference, shall forever be guaranteed in this State; and no person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State."

[3]Education Code section 8506 in substance provides that no governing board of a public elementary or secondary school in this state may require pupils to attend any class that involves family life or sex education. If such classes are in fact to be offered in the public elementary and secondary schools, the parent or guardian of each pupil enrolled in such class shall first be notified in writing of the class. The notice is to be sent through the regular United States mail to all parents. Each parent is to be provided the opportunity to request in writing that his child shall not attend the class and further no child may attend such a class if a request that he not attend the class has been received by the school. The statute further provides that any written or audio-visual material to be used in such a class shall be made available for inspection by the parent or guardian of such child at reasonable times and places prior to the holding of such a class and the parent or guardian shall further be notified in writing of his opportunity to inspect and review the materials. Each of the five respondent school districts has complied with the requirements of section 8506. Education Code section 8701, initially overlooked by the parties, provides in substance that whenever any part of the instruction in health, family life or sex education conflicts with the religious training and beliefs of the parent or guardian, that student shall be excused from that part.

**6**

failure of amended complaint to state a cause of action must be affirmed.[4]

[1]We have decided to dispose of the parents' procedural contentions by this footnote. The record indicates that the original complaint was filed on September 6, 1968, and immediately amended on September 11, 1968. The county promptly filed an answer and demurrer but by stipulation, the demurrer was not heard and a first amended complaint filed. The county's demurrer to the first amended complaint was subsequently sustained as to counts V through X of the first and second causes of action and an answer filed as to the remaining counts (I-IV of the first and second causes of action). Subsequently, on July 9, 1969, the county filed a motion for summary judgment that was denied. Immediately thereafter, on September 2, 1969, the county filed an "at issue" memorandum. In December 1970, by stipulation, the parents were once again allowed to amend their first amended complaint to add additional defendants, counts XI and XII to the first cause of action, and 12 new and supplemental causes of action. The county's general demurrer filed to the re-amended first amended complaint was overruled on April 15, 1971. On January 13, 1972, the county filed a motion for judgment on the pleadings; this motion was denied on February 24, 1972. A pretrial order setting trial for January 1973 was filed on November 16, 1972, and specifically indicating that all law and motion was complete, with the exception of the county's motion to dismiss. On December 13, 1972, the county moved to dismiss the amended complaint on grounds of failure to state a cause of action as a matter of law. In January 1973, this motion was granted and this appeal ensued.

The parents initially contend that by the ruling sustaining the demurrer and the granting of the county's motion to dismiss, they were deprived of a fair hearing and therefore deprived of due process. As their contention that all pretrial terminations of actions are unconstitutional is so patently without merit that it does not warrant further discussion, we simply note that the parents did not attempt to file a jurisdictional writ to test their strange theory (1 Witkin, Cal. Procedure (2d ed.) Jurisdiction, § 194). The contention that the motion to dismiss was a speaking motion is equally without merit. A speaking motion to dismiss or strike is one that is supported by facts outside the pleading, set forth by affidavit or declaration (*Vesely* v. *Sager*, 5 Cal.3d 153, 167 [95 Cal.Rptr. 623, 486 P.2d 151]). Here, the motion was made for dismissal, immediately before trial and without any submission of new matter and the sole question was whether or not a cause of action had been stated by the amended complaint (cf. *McKay* v. *County of Riverside*, 175 Cal.App.2d 247, 248-249 [345 P.2d 949]).

The parents further contend that the instant motion to dismiss must be considered as a renewed motion for summary judgment and, therefore, subject to the sanctions of Code of Civil Procedure section 1008. They also urge that since the county's 1969 motion for a summary judgment was denied by a different court than the one that dismissed the complaint in 1973, the last court's dismissal was improper and in excess of its jurisdiction, as a successor judge cannot review, modify or reverse final orders of his predecessor. The parents' contention here is entirely without merit. The motion to dismiss was not a review, modification or reversal of any final judgment made by a prior court in the instant action. After the summary denial without opinion of the county's motion for judgment on the pleadings on February 24, 1972, the matter was set for trial. As indicated above, the pretrial conference order specifically indicated that all law and motion was complete with the exception of the county's motion to dismiss. We do not think Code of Civil Procedure section 1008 has any application to the instant case. Furthermore, as clearly spelled out in the lower court's excellent memorandum opinion, the county's final motion to dismiss was granted on the basis of the failure of the amended complaint to raise any substantial question of law. In reaching its conclusion, the court below properly considered the pleadings in the light most favorable to the

Before turning to the issues involved, a brief summary of the salient aspects of the program in issue is warranted.

The record indicates that in the San Bruno Park School District, one of the four phases of the program has to do with biological aspects of family living, as outlined in the Teachers' Resources Guide. Family life education is taught in various schools and in various grades but the program varies in each grade and school. Family life education at the time here pertinent was being taught to classes containing 3,106 students; 128 of these asked to be excluded.

The Millbrae School District had a sex education program for grades 5, 6, 7 and 8 during the 1970-1971 school year. Of the 1,550 students enrolled, 158 asked to be excluded.

The Hillsborough City School District taught family life education in grades 6, 7 and 8. Of the 181 6th grade students enrolled in the program in 1969-1970, 20 asked for a course on conservation as an alternative to the unit on human reproduction.

The San Carlos School District has a biological unit taught as a supplement to the health and science course of study in grades 3 through 8. Of the 2,179 students enrolled in the district in grades 3 through 8 at the time here pertinent, 2,015 were in the program; 104 asked to be excluded.

In the South San Francisco Unified School District, family life education is taught from kindergarten through grade 12 with certain phases emphasized in certain grades. Of the 13,000 students taking the course in 1970-1971, 15 asked to be excluded.

In each district, the respective programs were taught by specially selected teachers who had received special training.

The exhibits filed by each of the districts consist of the Teachers' Program Guides. The guides are substantially similar in content but the level of the program, discussion tapes and reading materials increase in

parents and ruled on the constitutionality of Education Code section 8506. Thus, there was no resubmission of any previously determined final matters, but a determination that the complaint failed to state a cause of action for either declaratory or injunctive relief. The court below did not abuse its discretion and properly acted within its jurisdiction in dismissing the action.

detail and complexity for the upper grades. Each guide is divided into three categories: 1) concepts and understandings; 2) learning experiences and examples of content; and 3) resource materials, including publications and films to be used. For example, the guide for grades 7 through 8 in one of the districts relates to problem-solving techniques learned in the family that become part of one's personality. The learning experience and example of content suggested the inclusion of role-playing family discussion to solve the problem of division of family chores and suggests a series of readings that include Neff, Ethics for Everyday Living; Seashore, How to Solve Your Problems; Randolph, Self-Enhancing Education; and Ginott, Between Parent and Child.

Under the concept of training and guidance of children, the program also suggests for discussion a debate on "Spare the Rod and Spoil the Child" and "Children Should be Seen and not Heard." Also included are topics such as citizenship, fiancial responsibility, and the roles and responsibilities of children in the family. Among the suggested learning experiences and examples of content under financial responsibilities are a list of items to be included in a family budget and the role-playing of a situation in which the parents have to weigh alternatives in making the family income stretch to meet the needs of various family members. As to roles and responsibilities, it is suggested that students write a story: "My parents expect too much of me" or "My parents don't expect enough of me." Among the concepts and understandings included is that most teenagers have problems with parents and most parents have problems with teenagers. The guide suggests that the absence of problems indicate that no growth is occurring past preadolescence.

On the unit relating to normal sexual development from infancy to adulthood, the guide indicates that the teachers should not indicate that certain kinds of a behavior are good or bad, right or wrong, but indicates simply various kinds of normal behavior patterns. As to an area entitled "Unusual Behavior" which includes such topics as child molestation, exhibitionism, homosexuality and prostitution, the guide indicates that this unit is to be withheld until the background material written by the consultants is prepared. Under the concept of the family and home as the basic unit in American life, suggested for brainstorming, are topics such as what changes are taking place in family units, and include such readings as the History of the American Family by Kenney.

In the version used at all of the grade levels, the program clearly indicates that there are many kinds of families and that family

composition may change from time to time. Among the suggested experiences are: a story describing the family and all of the significant changes that occurred in the family since the student was born; and a family scrapbook.

In the unit under economic factors, it is suggested that the students write a story describing how the work of the parents affects the family's ways of living and how the family decides how to share and expend its resources.

In the unit on human reproduction, the concepts and understandings to be reviewed are the male and female reproductive systems. As to sexual intercourse, there is a special note to the teachers indicating that it should be explained as a natural sequence of studying the reproductive process, and that the physiological facts should be dealt with within the framework of human love of husband and wife and the means of producing new life.[5] As to sexual behavior, the concepts and understandings cover a broad range of behavior and emphasize that curiosity and interest about one's own body are normal and acceptable, including infantile masturbation. The teacher is told to answer questions honestly and sincerely and not to interpret the material and when covering topics, such as masturbation, contraception, abortion and divorce, to indicate that there are many different points of view concerning them, that it is important that each person live within the framework of his religion or moral code of behavior. The section on learning experiences, expressly states: "*Masturbation:* Excessive or prolonged masturbation is thought by psychologists to be a symptom of other emotional problems. Some religions regard masturbation (when it is consciously performed as a substitute for sexual intercourse) as an immoral act to be discouraged.

"The teacher should not say that it is 'bad' or 'good' or 'right' or 'wrong' but should give the above as facts."

Under the concept heading of value of sex within the marriage are covered the legal consequences of sexual intercourse outside of marriage. The learning experience section suggests a discussion of the legal, emotional, social and spiritual consequences of sexual intercourse

---

[5]Arguably, this could be contrary to one traditional Roman Catholic view, but also is consistent with Pius XI encyclical on Christian Marriage. (See St. John-Stevas, *A Roman Catholic View of Population Control*, 25 Law & Contemp. Prob. 445, at pp. 446-447.)

outside of marriage.[6] In the concept entitled family planning, the outline lists the various factors relating to family planning, including degree of mutual adjustment, economic factors, religious viewpoints, effect on other children, and the number of children and capacity of the parents to care for them, the health of the father and mother and mutual agreement. Under means of planning for pregnancy, it is suggested that medical care is indicated if parents are unable to have children. The means of limiting family size include abstinence, rhythm and contraceptives. The remaining experiences section contains the following note to the teachers: "If questions arise, pupils may be told that there are contraceptives, but that there are varying viewpoints concerning their use. Married couples should seek the advice of their physician and/or religious counselor.

"Teacher background information related to contraceptives is being prepared by the sub-committee from the Medical Society and the sub-committee on Moral & Ethical Values and will be distributed as soon as completed and approved by the Family Life Education Committee."

In a unit entitled "Self-Understanding—Emotional Development," the learning goals are: to contribute to a student's developing concept of himself as a person; to stimulate growth and self-understanding and personal responsibilities; to increase competence in developing and maintaining mutually satisfactory interpersonal relationships; and to suggest methods of seeking solutions to personal and family problems through increased insight into the needs and behavior of individuals.

Under emotional maturity, some of the suggested learning experiences and examples of content are "How do you act when you are angry?" "Does everyone feel angry at times?" and "What are some good ways to handle this feeling?"

The allegations of the many pleadings comprising the amended complaint and the attached exhibits (a class action on ·behalf of all similarly situated parents, as well as on behalf of their children who are students in the public schools of the county) may be summarized as follows: 1) the county's Family Life Education Program (hereafter

[6]Thus, the exhibits provide no basis for the parents' contentions that the program encourages and promotes premarital sexual intercourse.

program) interfered with the parents' and the students' free exercise of religion; 2) the program was not neutral but, in fact, established a new and different religion; 3) the excusal system, pursuant to Education Code sections 8506 and 8701[7] did not, in fact, exist and even if an excusal system were in force, it is unconstitutional as it is discriminatory and deprives the parents and students of equal protection and due process; 4) the excusal system of Education Code sections 8506 and 8701 had elements of coercion that violate the free establishment clause; 5) as the program interfered with the right of parental control, it deprived the parents and students of life, liberty and the pursuit of happiness;[8] 6) as to the right of privacy, the program deprived the parents of their right of privacy, the program deprived the parents of their right to control the education of their children in matters relating to marriage, the family, marriage and sex, and also deprived the students of privacy of mind as they were forced to reveal their innermost personal and private feelings and the intimate details of family life to teachers and fellow students; and 7) the program also deprived both the parents and students of equal protection, as well as procedural and substantive due process.

As indicated above, the instant complaint sought declaratory relief as to the unconstitutionality of the program and Education Code section 8506, as well as injunctive relief prohibiting the continuation of the program. The major thrust of each of the parents' contentions on appeal is that they have alleged sufficient facts or raised factual questions as to the constitutional issues raised, so that they were at least entitled to a trial on the merits and entitled to prove the allegedly disputed questions of fact raised by their lengthy amended complaint. Contrary to the parents' repeated assertions, the mere pleading of the unconstitutionality of the program and statutes in issue is not sufficient to overcome the dismissal of their complaint based on its failure to raise any substantial constitutional questions as a matter of law.

### I—Contentions Relating to Freedom of Religion

The parents and amicus curiae first assert that since they have alleged violations of the free exercise and establishment of religion clauses,

---

[7] As indicated above at footnote 3, the parties apparently were not aware of Education Code section 8701 until the oral argument on this appeal.

[8] As subsequently indicated, although this argument is based on the parents' and students' First Amendment rights, we have chosen to discuss it under the heading of privacy. Our view that "happiness" fits more logically with privacy is consistent with article I, section 1 of the state Constitution, quoted above in footnote 2. (*White* v. *Davis,* 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].)

they have stated several causes of action. However, not all infringements of religious beliefs are constitutionally impermissible. A state may require vaccinations against disease of those who object on grounds of transgression of religious beliefs (*Jacobson* v. *Massachusetts*, 197 U.S. 11 [49 L.Ed. 643, 25 S.Ct. 358]), prohibit polygamy (*Reynolds* v. *United States*, 98 U.S. 145 [25 L.Ed. 244]), or require the observance of child labor laws (*Prince* v. *Massachusetts*, 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438]). The issue, properly framed, therefore, is not whether the parents' objections to the program are a matter of religious belief, but whether the program violates the free exercise and establishment clauses of the First Amendment, as construed by the United States Supreme Court. While we recognize that the individual rights guaranteed by the free exercise and establishment clauses of the First Amendment (and the state Constitution)[9] interface and overlap, we think a separate discussion of these two clauses is more helpful here to clarify the complex issues presented in this "extraordinarily sensitive area of Constitutional law" (*Lemon* v. *Kurtzman*, 403 U.S. 602, 612 [29 L.Ed.2d 745, 755, 91 S.Ct. 2105]).

### A—*The Free Exercise Clause*

■ The Supreme Court of Hawaii in *Medeiros* v. *Kiyosaki* (1970) 52 Hawaii 436 [478 P.2d 314], faced an identical question with an excusal system substantially like that provided by Education Code sections 8506 and 8701.[10] The court said at page 317: "It has been argued that *requiring* attendance at sex education courses would burden the free exercise of religion of those who honestly believe that exposure to certain subjects covered within those courses is sinful or that sex education must

[9]Our present decision is grounded in both the federal and state Constitutions. Although some recent decisions of the California Supreme Court have established that comparable federal and state constitutional provisions are not necessarily co-extensive (see, e.g., *People* v. *Krivda*, 8 Cal.3d 623, 624 [105 Cal.Rptr. 521, 504 P.2d 457]; *Rios* v. *Cozens*, 9 Cal.3d 454, 455 [107 Cal.Rptr. 784, 509 P.2d 696]), we need not explore potential variations in application here, for we believe the same conclusion is mandated by each fundamental document. For convenience, this opinion utilizes "free exercise" and "establishment" clauses based on the specific clauses of the First Amendment of the federal Constitution to refer to the relevant freedom of religion guarantees of both the federal and state Constitutions (cf. *White* v. *Davis, supra*).

[10]We have elected to discuss the contentions pertaining to the constitutionality of the instant excusal system in a subsequent portion of this opinion. The parents here also attempt to argue that *Medeiros* is not controlling as the constitutionality of the excusal system was not in issue. We do not agree with this limited reading of *Medeiros. Medeiros*, although decided after a trial on the merits, does not in any way support the parents' contentions as to the sufficiency of their amended complaint.

be accompanied by moral instruction." In *Medeiros,* as here, the parties based their "free exercise" argument on *Abington School Dist.* v. *Schempp,* 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560]. As the Supreme Court of Hawaii pointed out, *Schempp* concerned two state laws: one requiring that at least ten verses from the Holy Bible should be read; the other, the recitation of the Lord's Prayer, without comment, at the opening of each public school day. These statutes also provided that any child shall be excused from the Bible reading or prayer, or attending such Bible reading or prayer, upon the written request of his parent or guardian. Justice Clark, in delivering the opinion of the court, held that the reading from the Holy Bible and the recitation of the Lord's Prayer were religious in character and were, therefore, ipso facto, violative of the establishment clause.[11] As the court pointed out at page 223 [10] L.Ed.2d at p. 858]: "The distinction between the two clauses is apparent—*a violation of the Free Exercise Clause is predicated on coercion* while the Establishment Clause violation need not be so attended." (Italics supplied.)

The *Medeiros* court then continued at pages 318-319: "Equally pertinent to our discussion is the Supreme Court's holding in Epperson v. Arkansas (393 U.S. 97, . . .) in which an Arkansas statute prohibiting the teaching of the Darwinian theory of evolution because such theory was contrary to the religious views of some of its citizens was held unconstitutional. At page 104 . . . the Court stated: 'Our courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief.' And at 106 . . . : 'There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma.'

"If we were to hold that the 'family life and sex education' program adopted by the State is contrary to certain religious beliefs of some of our citizens and therefore unconstitutional on the grounds that it prevents the free exercise of their religion, we would come dangerously close to approving that which is prohibited by *Epperson.* We must be equally protective of the freedoms of speech, inquiry and belief as we are of the freedom of religion." The Hawaiian court then concluded that there was no violation of the free exercise clause. An identical conclusion on the

---

[11]The essential element of the decision was that the prayer was intended to have and was perceived as having independent religious significance.

same grounds was reached by the court in *Cornwell* v. *State Board of Education* (D.Md. 1969) 314 F.Supp. 340 (cert. den. 400 U.S. 942 [27 L.Ed.2d 246, 91 S.Ct. 240]),[12] in granting motions to dismiss for failure to present a substantial federal question. The court said at page 344: ". . . the purpose and primary effect of the bylaw here is not to establish any particular religious dogma or precept, and that the bylaw does not directly or substantially involve the state in religious exercises or in the favoring of religion or any particular religion. The bylaw may be considered quite simply as a public health measure. As the Supreme Court indicated in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), "the State's interest in the health of its children outweighs claims based upon religious freedom and the right of parental control."

The parents and amicus curiae both rely on *Wisconsin* v. *Yoder,* 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526], for their free exercise contentions. In *Yoder,* the U.S. Supreme Court sustained the rights of Amish parents to keep their children out of the last two years of compulsory education required by state law, on the ground that their children would be placed in "an environment hostile to Amish beliefs."[13] Contrary to the contentions of the parents and amicus curiae

---

[12]The parents and amicus curiae here attempt to argue that *Cornwell* is distinguishable as it did not raise any constitutional issues concerning the subject matter and content of the course there in issue. While admittedly all of the issues here raised were not raised in *Cornwell,* we think the case is pertinent. In *Cornwell,* the taxpayers brought a civil action seeking to prevent the implementation of a program of sex education in the Baltimore County schools, pursuant to a by-law adopted by the Maryland State Board of Education on grounds that the by-law violated the free exercise and establishment clauses of the First Amendment of the United States Constitution, the equal protection and due process clauses of the Fourteenth Amendment and an asserted, exclusive right to teach their children about sexual matters in their own home.

[13]"As the record so strongly shows, the values and programs of the modern secondary school are in sharp conflict with the fundamental mode of life mandated by the Amish religion; modern laws requiring compulsory secondary education have accordingly engendered great concern and conflict. The conclusion is inescapable that secondary schooling, by exposing Amish children to worldly influences in terms of attitudes, goals and values contrary to beliefs, and by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child.

"The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs. See *Braunfeld* v. *Brown,* 366 U.S. 599, 605 (1961). Nor is the impact of the compulsory-attendance law confined to grave interference with important Amish religious tenets from a subjective point of view. It

the issues presented in *Yoder* did not necessarily require a trial on the merits and the case is not good authority for the contention that their amended complaint has alleged any cause of action. While it is repeatedly asserted that the program in issue here provides an interference with the free exercise of religion similar to that of *Yoder,* no part of the lengthy complaint specifically so alleges. There are only the general allegations of interference with First Amendment freedoms. Nor are there any specific allegations indicating what portions of the program are hostile to the beliefs of the parents.

Assuming, for the sake of argument therefore, that the above items constitute an infringement, we note that the free exercise clause has often been invoked by religious groups to gain exemption from laws of general applicability.[14] In *Sherbert* v. *Verner,* 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790], a Seventh Day Adventist refused, on religious grounds, to accept available employment; the South Carolina unemployment compensation statute provided that benefits could be withheld from any applicant who refused to accept available employment. In holding that the free exercise clause required the state to carve out an exemption for the petitioner, the Supreme Court reiterated the distinction between freedom to believe and freedom to act, first enunciated in *Cantwell* v. *Connecticut,* 310 U.S. 296 [84 L.Ed. 1213, 60 S.Ct. 900, 128 A.L.R. 1352]. The court in *Sherbert* established (at pp. 403-406 [10 L.Ed.2d at pp. 969-972]) a three-pronged analysis for determining when a restriction or regulation of conduct, based on religious belief, will be upheld without further inquiry: 1) where there is a substantial and direct threat to the public safety, peace or order (cf. *Chaplinsky* v. *New Hampshire,* 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766]); 2) in the absence of such threat, if disqualification from receipt of benefits did not impose any burden on the free exercise of the petitioner's religion; or 3) if any incidental burden on that free exercise was justified by a compelling state interest in the regulation of a subject within the state's constitutional

carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. As the record shows, compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region." (Pp. 217-218 [32 L.Ed.2d at pp. 26-27].)

[14]For this refinement of the issues here presented, we are indebted to *The Constitutionality Under the Religion Clauses of the First Amendment of Compulsory Sex Education in Public Schools* (1970) 68 Mich. L. Rev. 1050-1061.

power to regulate (*NAACP* v. *Button*, 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]).

Therefore, without conceding an infringement here, we proceed to apply the three-step analysis of *Sherbert* v. *Verner*, to the instant program. It is readily apparent that the parents' refusal to send their children to the program does not directly threaten the public safety, peace or order. We turn next to the contention that the program and the excusal system burden the free exercise of the parents' and the students' religion.

The parents and amicus curiae also urge that since Education Code sections 8506 and 8701 (set forth in full below)[15] require the affirmative

[15]Education Code section 8506 (added by Stats. 1969, ch. 977, § 1) provides: "No governing board of a public elementary or secondary school may require pupils to attend any class in which human reproductive organs and their functions and processes are described, illustrated or discussed, whether such class be part of a course designated 'sex education' or 'family life education' or by some similar term, or part of any other course which pupils are required to attend.

"If classes are offered in public elementary and secondary schools in which human reproductive organs and their functions and processes are described, illustrated or discussed, the parent or guardian of each pupil enrolled in such class shall first be notified in writing of the class. Sending the required notice through the regular United States mail, or any other method which such local school district commonly uses to communicate individually in writing to all parents, meets the notification requirements of this paragraph.

"Opportunity shall be provided to each parent or guardian to request in writing that his child not attend the class. Such requests shall be valid for the school year in which they are submitted but may be withdrawn by the parent or guardian at any time. No child may attend a class if a request that he not attend the class has been received by the school.

"Any written or audiovisual material to be used in a class in which human reproductive organs and their functions and processes are described, illustrated, or discussed shall be available for inspection by the parent or guardian at reasonable times and places prior to the holding of a course which includes such classes. The parent or guardian shall be notified in writing of his opportunity to inspect and review such materials.

"This section shall not apply to description or illustration of human reproductive organs which may appear in a textbook, adopted pursuant to law, on physiology, biology, zoology, general science, personal hygiene, or health.

"Nothing in this section shall be construed as encouraging the description, illustration, or discussion of human reproductive organs and their functions and processes in the public elementary and secondary schools.

"The certification document of any person charged with the responsibility of making any instructional material available for inspection under this section or who is charged with the responsibility of notifying a parent or guardian of any class conducted within the purview of this section, and who knowingly and willfully fails to make such instructional material available for inspection or to notify such parent or guardian, may be revoked or suspended because of such act. The certification document of any person

election of an exemption from the program or any of its parts, an informal pressure is exerted on the students to forego the exercise of their religious beliefs. Thus, they urge that, in effect, the students are required to participate in the program or parts of it, and there is, therefore, an interference with the free exercise of their religion. They urge that the only remedy to prevent this infringement is total prohibition of the program in the public schools of the county.[16]

While we recognize that the United States Supreme Court has held in cases arising under the establishment clause that informal social pressures can constitute compulsion (*Abington School Dist.* v. *Schempp,* 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560]; *Engel* v. *Vitale,* 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285]), the court has never applied that reasoning to the free exercise clause: for example, an express dictum in *Abington School Dist.* (at p. 233 [10 L.Ed.2d at pp. 864-865]) indicating that indirect social pressures are not sufficient to cause a violation of the free exercise clause. Further, in *Board of Education* v. *Barnette,* 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674], the court did not require the exclusion from the classroom of the students who objected on religious grounds to the flag salute and were excused from it. Nor did the court require that the flag salute ceremony be abolished simply because it interfered with the religious beliefs of some students.

Neither *Engel* nor *Abington School Dist., supra,* support the parents' contention that the instant excusal statutes subject the students to sufficient pressure to amount to compulsion. In both *Engel* and *Abington*

who knowingly and willfully requires a pupil to attend a class within the purview of this section when a request that the pupil not attend has been received from the parent or guardian may be revoked or suspended because of such act."

Education Code section 8701 (as amended by Stats. 1969, ch. 1307, § 1) provides: "Whenever any part of the instruction in 'health,' family life education, and sex education conflicts with the religious training and beliefs of the parent or guardian of any pupil, the pupil, on written request of the parent or guardian, shall be excused from the part of the training which conflicts with such religious training and beliefs.

"As used in this section, 'religious training and beliefs' includes personal moral convictions."

In its prior version (Stats. 1968, ch. 182, § 31), the statute read as follows: "Whenever any part of the instruction in 'health' conflicts with the religious beliefs of the parent or guardian of any pupil, the pupil, on written request of the parent or guardian, may be excused from the part of the training which conflicts with such religious beliefs."

[16]While this argument is not explicit in the briefs, it is the basis of the request for injunctive relief. The argument was made orally in response to questions from this court at the hearing on February 11, 1975.

*School Dist.,* the students had the option of either leaving the classroom or remaining during the religious exercises. The court's finding of compulsion was based on the fact that the students, by exercising either option, were in direct and immediate contact with their peers when they exercised their beliefs. There is simply not the same degree of pressure[17] where, as here, pursuant to Education Code sections 8506 and 8701, the parents and the students can choose not to enroll in the program or any part of it that is objectionable. We suggest that if, in accordance with the request for an injunctive relief, the trial court had enjoined the program because it incidentally offended the religious beliefs of certain parents and students, the court would have acted in violation of the establishment clause. In *Epperson* v. *Arkansas,* 393 U.S. 97, the court said, at page 106 [21 L.Ed.2d 228, 235, 89 S.Ct. 266], that there "can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibition of any religious sect or dogma." Thus, under *Epperson,* the state is required to plan its curriculum on the basis of educational considerations and without reference to religious considerations. This was clearly the case here, as indicated by the exhibits attached to the pleadings.

As so well stated by the court below in its excellent and well reasoned memorandum opinion: "Absent some serious contention of harm to the mental or physical health of the children of this state or to the public safety, peace, order or welfare, a mere personal difference of opinion as to the curriculum which is taught in our public school system does not give rise to a constitutional right in the private citizen to control exposure to knowledge."[18]

---

[17]We recognize differing degrees of pressure as to the lower grades where all or most of the instruction takes place in one location with one teacher than in the junior and senior high school grades where usually each subject is taught by a different teacher in a different location.

[18]The parents and amicus curiae also cite *Meyer* v. *Nebraska,* 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446], and *Pierce* v. *Society of Sisters,* 268 U.S. 510 [69 L.Ed. 1070, 45 S.Ct. 571, 39 A.L.R. 468]. In *Meyer,* the court held unconstitutional a statute that prohibited teaching any foreign language beyond the eighth grade to postpone the learning of "foreign ideas" until "American ideas" had been thoroughly inculcated (*id.* at p. 401 [67 L.Ed. at p. 1046]). *Pierce* held that requiring public school attendance to the exclusion of private schools unreasonably interfered with parental prerogatives in the upbringing of their children. As noted, however, in 43 So. Cal. L. Rev. 548, 566-567, Pierce does not grant parents a monopoly over the thoughts of their own children or any one else's. The granting of such a complete monopoly, even in the parent-child context, is inimical to the First Amendment premise that only unfettered exchange can guarantee the informed citizenry essential to a democratic society (*Edwards* v. *South Carolina,* 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680]; *Kingsley Pictures Corp.* v.

The final and third prong of *Sherbert* v. *Verner, supra,* is a free exercise clause balancing test that measures three elements of the competing governmental interest: first, the importance of the secular value underlying the governmental regulations; second, the degree of proximity that the chosen regulation bears to the underlying value; and third, the impact that an exemption for religious reasons has on the overall regulatory program. This assessment of the state's interest then has to be balanced against the claim for religious liberty that, in turn, requires an evaluation of two subfactors: first, the sincerity and importance of the religious practice for which special protection is claimed; and second, the degree to which governmental regulation interferes with that practice (Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development, Part 1. The Religious Liberty Guarantee,* 80 Harv.L.Rev. 1381, 1390). Applying each of these factors, we conclude that the compelling state interest in education provides a proper basis here.

*Spence* v. *Bailey* (6th Cir. 1972) 465 F.2d 797, cited at oral argument, is distinguishable. In *Spence,* the court held that a compulsory high school ROTC course required of male students for graduation transgressed on the student's free exercise of his religious beliefs as a conscientious objector since there was no compelling state interest in the military training course. In sum then, the direct answer to the parents' contentions concerning free exercise is that the program against which the parents seek a permanent injunction is not compulsory[19] as Education Code sections 8506 and 8701 provide that the student may be excused from any part that conflicts with the parents' religious beliefs or that uses materials to which the parents object. However, even assuming an infringement for the sake of argument, the incidental burden is justified by the compelling state interest in education.[20] (*Medeiros* v. *Kiyosaki,*

*Regents,* 360 U.S. 684 [3 L.Ed.2d 1512, 79 S.Ct. 1362]; *Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]).

[19]The best brief statement of this view is the concurring opinion of Justice Douglas in *Abington School Dist.* v. *Schempp, supra,* at page 227 [10 L.Ed.2d at p. 861], i.e., since the free exercise clause is written in terms of what the state may not require of the individual, the lack of any compulsion by the school district effectively disposes of any issue relating to the "free exercise" of religion.

[20]Similarly, in *Hardwick* v. *Board of School Trustees,* 54 Cal.App. 696 [205 P. 49], there was no compelling state interest in the compulsory social dancing program that was held to violate the free exercise and establishment clauses, as it was contrary to the religious and moral beliefs of the parent. However, courts have upheld a valid prescribed part of the curriculum courses in music, rhetoric, debating, composition, as well as participation in commencement exercises (see *Sex Education: The Constitutional Limits of State Compulsion,* 43 So.Cal.L.Rev. 548, 556-557).

*supra,* at p. 318; cf. *Hopkins* v. *Hamden Board of Education,* 29 Conn.Supp. 397 [289 A.2d 914]).

*B—The Establishment of Religion Clause.*

██ In *Everson* v. *Board of Education,* 330 U.S. 1, at page 15 [91 L.Ed. 711, 723, 67 S.Ct. 504, 168 A.L.R. 1392], the U.S. Supreme Court said that the establishment clause meant that: "Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." Further, it is also clear from the cases that the First Amendment does not mean that in every and all respects there shall be a "wall" and complete separation of church and state (*Zorach* v. *Clauson,* 343 U.S. 306, 312 [96 L.Ed. 954, 961, 72 S.Ct. 679]).[21]

As stated in *Epperson* v. *Arkansas,* 393 U.S. 97, 104 [21 L.Ed.2d 228, 234, 89 S.Ct. 266]: "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." The court in the *Epperson* case pointed out that the state may neither prefer any religion nor prohibit any theory just because it be deemed antagonistic to the principles or prohibitions of any religious sect or dogma.

██ The three main evils, against which the establishment clause was intended to afford protection, are sponsorship, financial support and active involvement of the sovereign in religious liberty (*Walz* v. *Tax Commission,* 397 U.S. 664, 668 [25 L.Ed.2d 697, 90 S.Ct. 1409]). ██ The applicable tests developed with respect to the establishment clause, as summarized by the U.S. Supreme Court in *Lemon* v. *Kurtzman,* 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105], are: "Every analysis in this area must begin with consideration of the cumulative

---

[21]Thomas Jefferson's metaphor of a wall, as distinct from a fine line easily overstepped (see *McCollum* v. *Board of Education,* 333 U.S. 203, 245 [92 L.Ed. 649, 676, 68 S.Ct. 461, 2 A.L.R.2d 1338]), has been the subject of much discussion and debate (Katz, *Freedom of Religion and State Neutrality,* 20 U.Chi.L.Rev. 426, at pp. 438-439), and it has been said that: "A rule of law should not be drawn from a figure of speech." since Jefferson did not exclude religious education from the University of Virginia, which he founded (*McCollum, supra,* p. 247 [92 L.Ed. p. 677], dissenting opn. of Reed, J.).

criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education* v. *Allen*, 392 U.S. 236, 243 (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz, supra,* at 674." (Pp. 612-613 [29 L.Ed.2d at p. 755].)

 In the instant case, the primary focus is on the second test as the parents alleged that the program "establishes new or different religious and spiritual practices and beliefs," as the program treats matters of morality, family life and reproduction in a manner that is hostile to their theistic religion.[22] Although the pleadings are lacking in specificity, we glean from the exhibits and the briefs that the parents' complaint refers to the fact that, among others, the program deals with subjects such as abortion, birth control, divorce and masturbation. Our examination of these documents indicates that most of these sensitive areas are carefully delineated with cautionary instructions to the teachers to indicate that a variety of beliefs and practices exist. The teachers are also instructed to refer their students to their parents and religious counselors for guidance and information as to specifics. For example, under the subject of birth control, all present day methods are listed. Thus, there is evidence of neutrality in the religious sphere and ample support as a matter of law for the trial court's finding that the subjects are not covered from a religious point of view, but simply as public health matters.

A similar conclusion was reached with respect to a mandatory health education course in *Hopkins* v. *Hamden Board of Education,* 29 Conn.Supp. 397[23] [289 A.2d 914], where the court denied a temporary injunction and upheld a compulsory health and physical education course that included family life and sex education.

[22]The United States Supreme Court, however, in *Torcaso* v. *Watkins*, 367 U.S. 488 [6 L.Ed.2d 982, 81 S.Ct. 1680], struck down a provision of the Maryland Constitution requiring specified state officials, as part of their oath of office, to declare a belief in God. The court held that religious liberty is not limited to theistic beliefs and at page 495, footnote 11 [6 L.Ed.2d at p. 987], recognized secular humanism as a religion in this country. A similar conclusion was earlier reached by this court (Division One) in *Fellowship of Humanity* v. *Co. Alameda*, 153 Cal.App.2d 673 [315 P.2d 394].

[23]The parents attempt to distinguish *Hopkins* as no claim of violation of individual rights was made and the matter was not a class action but only an application for a temporary injunction by the affected students and their parents. The significant distinguishing factor of *Hopkins* is that the program there was a compulsory one. Thus, we have found the case helpful in discussing the parents' contentions that some aspects of the statutory refusal system here in issue have elements of coercion and compulsion.

In *Hopkins, supra,* the court said at page 923, in language equally apt here: "In Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790; the United States Supreme Court held that the religious clauses of the first amendment were not violated by public grants to certain Connecticut church-related colleges and universities for construction of buildings and facilities to be used exclusively for secular educational purposes. The court found that the purposes of the use of the public funds were religiously neutral and that there was no violation of the plaintiffs' rights under the establishment or free exercise clauses of the first amendment. . . . [the] plaintiffs were unable to identify any coercion directed at the practice or exercise of their religious beliefs which would relieve them from the duty to pay taxes. Under our democratic system, citizens of every religious conviction are required to pay taxes. Walz v. Tax Commission, supra.

". . . Judicial concern that the legitimate secular objectives of the state education laws might possibly be violated by conscious design of one or more school teachers or school administrators does not warrant striking down the constitutional legislative authority of the course as unconstitutional. There is no evidence of any such affirmative acts.[24] There is evidence of neutrality in the religious sphere and only a fear that instruction in the health curriculum could possibly conflict with individual beliefs. The court cannot assume that any religious activities seep into or permeate the secular purposes of the curriculum. Since the plaintiffs are unable satisfactorily to identify any coercion directed at the practice or exercise of religious beliefs, there can be no violation of the free exercise clause of the first amendment. There is evidence only that secular teaching might conflict with individual religious beliefs. See Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060.

"The governmental and public interests of the state in its educational system are of a kind and weight sufficient to relieve it from claims of violations of the first amendment solely on the ground that its wholly secular purposes could possibly clash with a religious belief of the plaintiffs in one or more areas of the curriculum. Unfair or unreasonable burdens do not appear which would or could violate the plaintiffs' religious guarantees."

---

[24]In the instant case, likewise no facts relating to affirmative acts have been alleged. We also note that although the parents indicated at oral argument that the statutory excusal system was not working, no such allegations were made in the amended complaint.

The court then continued at page 924: "It must be made clear that it is not the function of this court to evaluate a religious belief for ecclesiastical purposes. School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844; State v. Yoder, 49 Wis.2d 430, 182 N.W.2d 539. Also irrelevant is this court's opinion of the validity, reasonableness or merits of one's religious beliefs. State v. Yoder, supra.

"This case primarily questions the right of the parents to regulate the education of their children in public schools as the parents' religious beliefs dictate, as against the justification of the state for regulating public education in a manner which might in some respects conflict with those beliefs. To permit such interference in the public school system by parents under the circumstances of this case could, unjustifiably, only tend to render a well-regulated public school system vulnerable to fragmentation whenever sincere, conscientious religious conflict is claimed. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213, indicates quite clearly that this was not the intent of the guarantees under the first amendment, and that the state's interests must also be weighed and the public protected.

"The courts have repeatedly held that unconstitutionality based on alleged violations of the religious clauses of the first amendment must be decided on the facts as they appear in each particular case. A study of the cases offers no clear and specific guidelines or rules of law for assistance to the court. In the present case, the curriculum offered is primarily one of a public health nature. It has not been established that serious constitutional questions are involved, even though the parents claim that their rights of control of the child in religious scruples indicate to the contrary. Claims and questions similar to those raised in this count have been held by the federal courts to be inadequate to raise constitutional questions based on the first amendment. See Murdock v. Pennsylvania, 319 U.S. 105, 109, 63 S.Ct. 870, 87 L.Ed. 1292; Cornwell v. State Board of Education, D.C., 314 F.Supp. 340, 342, aff'd, 4 Cir., 428 F.2d 471, [25] [cert. den. 400 U.S. 942 (27 L.Ed.2d 246, 91 S.Ct. 240)]. The *Murdock* case concerned the balancing of the interests of the individual against the interests of the state. See Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645."

[25]Similarly in *Cornwell, supra,* the court reviewed the cases pertinent to the establishment clause (at pp. 343-344): *Engel* v. *Vitale,* 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285], wherein official prayers to be recited in the classroom were held unconstitutional; *Chamberlin* v. *Public Instruction Bd.,* 377 U.S. 402 [12 L.Ed.2d

Nor can we find any indication in the guidelines that the program affirmatively espouses the view that religious beliefs are irrelevant to matters of family life and sex. To the contrary, the program encompasses a wide variety of family life styles and in careful recognition of the diversity of religions and points of view that enhance and enrich the diverse culture and population of the country and the Bay Area, directs the instructors to refer students to their parents or religious advisors for specific instruction.

We agree with the trial court's conclusion of law that the portions of the program challenged simply do not relate to, or seek to establish any religious concept, dogma, idea and precept; nor does the program involve the county school system directly, indirectly or substantially in any way in the establishment of a "religion," or the exercise thereof, or in favoring one religion over another, or for that matter, any particular religion. The program areas that the parents challenge are simply not religious in nature but primarily involve education and public health. The fact that the parents possess certain ideas or views concerning family life relationships and sex which are based on moral standards that are the outgrowth of their religious principles does not make the teaching of sex education and family life religious in nature, nor does it constitute the establishment of a religion in the public schools. Thus, the trial court properly concluded that the complaint alleged no triable factual issues as to these matters.

The parents' contention here overlooks the fact that while in *Abington School Dist.* v. *Schempp, supra,* page 231 [10 L.Ed.2d at p. 863], the court held that the reading of the Bible and prayer at the beginning of each school day without comment violated the establishment clause because of the independent religious significance of the reading (at p. 223 [10

---

407. 84 S.Ct. 1272], and *Schempp, supra,* where devotional Bible reading and recitation of the Lord's Prayer were held to be in violation of the First Amendment; and *McCollum* v. *Board of Education,* 333 U.S. 203 [92 L.Ed. 649, 68 S.Ct. 461, 2 A.L.R.2d 1338], where the *employment of teachers by private religious groups to give religious instruction* in the schools to those children whose parents desired it was held to be proscribed. The *Cornwell* court then continued at page 343: "On the other hand, where *such overt religious activities have been absent,* the Supreme Court has upheld governmental programs *even though they had some religious connection. . . . Everson* case, *supra,* where the *reimbursement of parents for transportation expenses to parochial schools* was upheld. Zorach v. Clauson, *supra,* where a *released-time program* allowing students to attend religious instruction centers off school grounds during the school day was upheld, and Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), *where the loan by the state of textbooks to students in parochial schools was also upheld.*" (Italics added.)

L.Ed.2d at pp. 858-859]), the majority (at p. 225 [10 L.Ed.2d at pp. 859-860]) and two of the three concurring opinions (at pp. 300 and 306 [10 L.Ed.2d at pp. 902-903 and 905-906]) explicitly distinguished those practices that have an essentially religious character because of attendant ritual and history, and seemingly identical practices that in a different context are intended to implement secular educational purposes. The majority opinion said at page 225 [10 L.Ed.2d at pages 859-860]: "We agree of course that the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe.' *Zorach* v. *Clauson, supra,* at 314. We do not agree, however, that this decision in any sense has that effect. In addition, it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment."[26] Any other approach would permit any group of parents or students to create chaos in the school system by attempting to enjoin any portion of a school curriculum that allegedly did violence to or interfered with any religious belief. Thus, parents and students whose religious beliefs prohibited the consumption of certain kinds of (or any) meat could interfere with and negate those aspects of a curriculum in nutrition that suggested meat as a good source of protein. Thus, there is no basis for the argument that the program in effect establishes a "religion of secularism" in the schools (cf. *Abington School Dist.* v. *Schempp,* 374 U.S. 203, at p. 225 [10 L.Ed.2d 844, at pp. 859-860]).

---

[26]Section 4, article I of the state Constitution provides, in pertinent part: "The free exercise and enjoyment of religious profession and worship, without discrimination of preference, shall forever be guaranteed in this State; . . ." (quoted in full at fn. 2 above) is a guarantee of religious equality. As stated in 25 Ops. Cal. Att. Gen. 316 at page 319: "Moreover, nothing in the history of this provision suggests that the constitutional draftsmen held any mental reservations concerning the broad and emphatic language which they used. Section 4 of article I is based on the Constitution of New York and goes back to the New York Constitutional Convention of 1777. The principal religious controversy at that convention centered around a proposal (which was defeated) that Catholics be required to take a loyalty oath. A proposal that the state encourage religion was also rejected. Early drafts of the section guaranteeing religious freedom show that careful consideration was given to language, and that the New York framers progressed from such words as 'toleration' to broader terms like 'enjoyment'. At first it was proposed to list certain religious groups which would be accorded the benefits of the section, but it was ultimately decided to mention no particular religion by name and thus, in effect, to

As so well stated by the trial court in its succinct and well-written memorandum opinion: "If on the other hand, the plaintiffs contend that the curriculum and material being taught in the challenged courses are contrary to their particular religious beliefs and even though their children are not required to attend such courses, they still have a constitutional right to have such material conform to their religious

extend the principle of religious impartiality to all (see 1 Charles Z. Lincoln, The Constitutional History of New York, p. 541, et seq.). In the California Convention of 1849, the New York section was chosen after a debate in which the language of the Virginia Constitution was urged as a substitute. The Virginia Constitution referred to the duty owed the 'Creator' and admonished all men to display 'Christian' forbearance, love, and charity (Report of the Proceedings of the California Convention of 1849, pp. 38-39). The Constitutional Convention of 1879 put section 4 of article I in its present form by changing the word 'allowed' to 'guaranteed'—a further indication of the emphatic character of this constitutional principle."

Thus, the state constitutional guarantee, like the federal one, forbids "any type of discrimination or preference" in "the enjoyment of religious profession," and, as with the federal Constitution, "Religious guarantees in our constitutions stem not from opposition to religion but from respect for it—and for the right of each person to determine for himself his fundamental faith. Children, as they become aware of the religious differences of our people, should be made to understand the true character of the public school's religious neutrality; the omission of religious services from the public school curriculum should never be allowed to assume the appearance of state hostility to religion.

"Although direct instruction in religious principles may not be given in the public schools, it does not follow that every reference to anything religious is prohibited. A course in the history of California which did not describe the early Catholic missions is unthinkable: Father Junipero Serra is justly regarded as one of the great figures in our history and in fact his statute is one of two representing California in the Hall of Fame at the nation's capitol. A high school course in European history could not properly omit reference to the great religious controversies of the middle ages, such as the struggle over lay investiture; and such a course would also devote substantial time to a study of the Protestant Reformation. Instruction concerning the Constitution would similarly involve study of the history of the struggle for religious freedom in colonial times. Religious subjects have many times been used in art and music; Da Vinci's 'Last Supper,' Michelangelo's 'Moses,' the 'Winged Victory' of Samothrace, an Indian totem pole—all have religious significance, and yet all are appropriate for study in a public school class on art. The playing of passages from Beethoven's 'Missa Solemnis' in a music class would not violate constitutional restrictions any more than the playing of Wagner's 'The Valkyrie'.

"Even the Bible itself need not be excluded. It has exerted, and still exerts, a great influence upon English and American literature. Not only may it be discussed in a general way in an appropriate literature class but specific passages, because of their eloquence or poetic beauty, may be used for special study, such as the Song of Ruth or Paul's great tribute to Charity.

"No doubt the indirect use of religious subjects in classes in art, music, literature, and history could be carried to extremes which would offend constitutional guarantees. Properly presented, however, such materials need not involve the promotion of religion. Use of the Bible in the public schools may be proper even though public school use of the Bible *for religious purposes* is prohibited by our constitutions." (*Supra*, at p. 325.)

beliefs, then clearly there is no such constitutional right. If such were not the case, it is obvious that every citizen could seek to control the curriculum and material being taught in our public school system by simply asserting that such material was contrary to their particular religious beliefs. Thus various complainants could actually use the judicial process to in fact 'establish a religion,' in our public school system by using the courts to so control curriculum to ensure that the same would conform to the particular religious concepts of the complainants. It is simply not for the courts in the constitutional sense to order conformity or limit non-conformity and thereby ensure that the limits of the curriculum subject matter will coincide with a particular religious point of view."

As stated in *Prince* v. *Massachusetts*, 321 U.S. 158 [88 L.Ed. 645, 64 S.Ct. 438], the state's interest in the health of its children outweighs claims based upon religious freedom and the right of parental control. The court stated "A democratic society rests . . . upon the healthy, well-rounded growth of young people into full maturity as citizens . . . . It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action." (Pp. 168-169 [88 L.Ed. at pp. 653-654].)

In sum, the program does not violate the free establishment clause.[27]

II—*Equal Protection and Substantive Due Process*

■ We turn next to the contention that the program deprives them of equal protection and due process under the U.S. Constitution. As the program on its face applies to all students equally and is taught to all students of mixed religious beliefs without discrimination, there is no denial of equal protection (cf. *Cornwell* v. *State Board of Education*, 314 F.Supp. 340, at p. 342; *Medeiros* v. *Kiyosaki*, 52 Hawaii 436 [478 P.2d 314 at p. 319]; *Hopkins* v. *Hamden Board of Education*, 29 Conn.Supp. 397 [289 A.2d 914, at p. 919]). Nor is there any merit to the contention that

[27]On February 18, 1975, the United States Supreme Court noted jurisdiction in *Roemer* v. *Maryland Board of Public Works*, 420 U.S. 922 [43 L.Ed.2d 391, 95 S.Ct. 1115], which raises the question of whether a statute providing public aid in the form of noncategorical grants to private colleges and universities accredited by the state violates the establishment clause. Although the contention concerns excessive government entanglement with religion, the case appears to be factually remote from the instant one.

the "separation" that results from the operation of the statutory excusal system is an unreasonable and discriminatory classification that deprives the affected students of equal protection.[28] There are no allegations or indications in the record that the county, in approving the program, acted either arbitrarily or unreasonably (*Hopkins* v. *Hamden Board of Education, supra,* p. 922).

We turn briefly to the contention that the parents are denied equal protection of the law because a burden is placed upon them to make a choice pursuant to Education Code sections 8506 and 8701. They also urge that the choice, in turn, burdens the students, who are not to participate in the program, or any part of it, by separating them from their regular classes. They contend that these several burdens result in discrimination between similarly situated parents or guardians and between similarly situated students. As indicated above, these contentions are without merit because the decision as to whether or not the students will participate and associate rests solely with the individual parents and students. As the court below indicated, there is thus *no improper state action in the constitutional sense that discriminates or precludes the students from participating in the program.* Accordingly, there is no improper discrimination or denial of equal protection.

As to substantive due process, we find persuasive the following from *Cornwell* v. *State Board of Education, supra,* p. 342: "*There is first no denial of substantive due process to the plaintiffs.* Under Section 6 of Article 77 of the Maryland Code (as amended and re-codified by Chapter 405 of the Acts of 1969), the State Board is directed to determine the educational policies of the state and to enact bylaws for the administration of the public school system, which when enacted and published shall have the force of law. Assuredly *it cannot be said that the bylaw here is an arbitrary or unreasonable exercise of the authority vested*

---

[28]The theoretical basis of this contention, elegantly and eloquently set forth in Kurland, *Of Church and State and the Supreme Court,* 29 U. Chi. L. Rev. 1, at page 96, is that the freedom and separation clauses must be read together so that there can be no classification based on religion either to confer a benefit or impose a burden. Therefore, any statutory excusal system, like that of Education Code sections 8506 and 8701, based on religious grounds, is unconstitutional. The U.S. Supreme Court so intimated in *Abington School Dist.* v. *Schempp, supra,* at pages 224 and 225 [10 L.Ed.2d at pages 859-860], citing *Engel* v. *Vitale, supra.* Further support for this theory is found in the concurring opinion of Justice Brennan in *Abington School Dist.,* at page 288 [10 L.Ed.2d at pages 895-896], which reasoned that the evils of the excusal opinion are equally present under both the establishment and free exercise clauses. This view, however, was not shared by the other members of the court, and has never been accepted as the controlling test by any court.

in the State Board to determine a teaching curriculum, nor *that there is no basis in fact for the legislative policy expressed in the bylaw.*" (Italics added; cf. *Medeiros* v. *Kiyosaki,* 52 Hawaii 436 [478 P.2d 314, at pp. 319-320].)

We conclude, therefore, that the trial court properly concluded that no cause of action was stated under the Fourteenth Amendment of the United States Constitution or the parallel provisions of the state Constitution.

### III-*Privacy, "Parental Authority" and the Asserted Exclusive Constitutional Right to Teach Family Life and Sex Education Only at Home.*

As to privacy, identical contentions were considered by the court in *Medeiros* v. *Kiyosaki, supra,* at page 316, with respect to an excusal system substantially similar to that of Education Code sections 8506 and 8701. "[A]lthough the right of privacy *is not specifically* afforded in the First Amendment of the United States Constitution, the Supreme Court of the United States has held that the Amendment '. . . has a penumbra where privacy is protected from governmental intrusion.' Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1968).

". . . . As stated by Justice Douglas in delivering the opinion of the Court at pages 485-486, 85 S.Ct. at page 1682:

" 'The present case, then, concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. And it concerns a law which, in forbidding the *use* of contraceptives rather than regulating their manufacture or sale, seeks to achieve its goals by means having a maximum destructive impact upon that relationship. Such a law cannot stand in light of the familiar principle, so often applied by this Court, that a "governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325. Would we allow the police to search the sacred precincts of marital bedrooms for tell-tale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.'

"Thus, the Supreme Court held where the *zone of privacy is invaded by the state by unnecessarily broad* means, its action is in contravention of the First Amendment. Connecticut had forbidden the *use* of contraceptives rather than merely regulating their manufacture or sale. This interdiction, the Court held, was unnecessarily broad." (Italics partially added.)

■ The question we now face is this: Can the county through its proper agencies adopt and initiate a curriculum of family life and sex education for use in its districts without invading its citizens' constitutional right to privacy? We must not look to see if there has been a possible or technical invasion of privacy but instead whether the government has by "unnecessarily broad means" contravened the parents' right of privacy.

The county in formulating policies for the adoption of the program anticipated possible objections by parents and guardians to the program. The Legislature, pursuant to Education Code sections 8506 and 8701, therefore, *established an "excusal system" whereby parents and guardians had the option of withholding or withdrawing their children from the program by submitting a written excuse to the school.* Furthermore, in order to allow the parents and guardians an opportunity to review the audio-visual educational materials used, Education Code section 8506, set forth the elaborate and detailed procedures for giving parents notice of and opportunity to review these materials to enable the parents to consider the content of the program and then submit a written excuse if they found it objectionable. In addition, section 8701 permits excusal at the written request of the parents on the broader ground of "any part of the program" that is objectionable to their religious beliefs.

We view the dual statutory "excusal system" as an effort by the county and state to allow those parents or guardians who might object to the program or any part of it on moral or religious grounds to have their children excused. *The program was in no way compulsory,* and, therefore, we cannot see how the state by "unnecessarily broad means" contravened the parents' right of privacy.

In support of their invasion of privacy theory, the parents cite two other cases: *Meyer* v. *Nebraska*, 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446], which upheld the rights of parents to have their children learn a foreign language, and *Pierce* v. *Society of Sisters*, 268

U.S. 510 [69 L.Ed. 1070, 45 S.Ct. 571, 39 A.L.R. 468], which upheld the rights of parents to have their children educated in private elementary schools. *Meyer* and *Pierce* are supportive of the *explicit freedoms of speech and press rather than the penumbral right of privacy.* Citing these two cases, the Supreme Court drew the following conclusion in *Griswold* v. *Connecticut,* 381 U.S. 479, at page 482 [14 L.Ed.2d 510, 514, 85 S.Ct. 1678]: "In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." Yet, this is the very thing that the plaintiffs would have this court do. *They seek to "contract the spectrum of available knowledge" by enjoining the county from continuing with its family life and sex education program.* (Italics supplied.)

The parents and amicus curiae also contend that the program invades the students' right of privacy by requiring them to reveal their innermost thoughts, conversations and facts relating to the personal and intimate lives of their families[29] and invade the privacy of mind of the parents and students. We cannot agree that the subject matter discussed by the program compels the disclosures mentioned by the parents. The same applies to the asserted right of exclusive parental control and authority.

It follows that the trial court properly concluded that Education Code section 8506 is constitutional. The parents' contention that the excusal system of section 8506 is too narrow in scope is vitiated by the broader exclusion provision of Education Code section 8701, which by its terms permits the excusal of the students from the entire program. We hold that the sections, construed together, are constitutional and do not infringe on any rights of the parents under the First, Ninth and Fourteenth Amendments of the United States Constitution and the parallel provisions of the state Constitution.

As to "parental control," we adopt, with minor stylistic changes, the excellent discussion of the court below. The parents further assert that,

---

[29]In this connection, we note that the objection is also taken to those portions of the program that relate to family finance management. The proper understanding and allocation of family resources (also known as Consumer Education) is a proper and well recognized part of the curriculum of the schools of this state and many others. In fact, the establishment of a Consumer Program at the state level in California predated that of most other states (see Stats. 1959, ch. 467, relating to the Consumer Counsel, now Bus. & Prof. Code, § 300 et seq.).

contrary to the First Amendment of the United States Constitution,[30] the activities of the county deprive them and their students of their rights to liberty and the pursuit of happiness and that such conduct usurps parental authority. These contentions are without merit, since they presuppose that the Legislature and the county may not make available various courses of studies to all students upon an elective or withdrawal basis. As previously pointed out, the students are not compelled to attend any part of the program and if there is parental objection, may summarily withdraw from any part or the entire program. The Constitution of the United States does not vest in objectors the right to preclude other students who may voluntarily desire to participate in a course of study under the guise that the objector's liberty, personal happiness or parental authority is somehow jeopardized or impaired. To adhere to such a concept would use judicial constitutional authority to limit inquiry to conformity, and to limit knowledge to the known.

We note that as stated in *Wisconsin* v. *Yoder,* 406 U.S. 205, at pages 234-235 [32 L.Ed.2d 15, at pages 35-36, 92 S.Ct. 1526]: "Our disposition of this case, however, in no way alters our recognition of the obvious fact that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discreet aspects of a State's program of compulsory education. *This should suggest* that courts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements." (Italics added.) We think this is still the applicable principle to be followed by courts. We do not consider pertinent to the instant case some of the recent cases of "interference" cited at oral argument.[31]

Finally, the parents and amicus curiae contend that they have an exclusive constitutional right to teach their children about family life and *sexual matters in their own homes, and that such exclusive right would prohibit the teaching of these matters in the schools.* No authority is cited in support of this novel proposition, and this court knows of no such

---

[30]Although the allegations as to "parental authority" are purportedly based on the First Amendment, we think the concept fits better in the context of privacy and have, therefore, discussed it here.

[31]These cases included *Glaser* v. *Marietta* (D.C.Pa. 1972) 351 F.Supp. 555, 561, and *Ingraham* v. *Wright* (5th Cir. 1974) 498 F.2d 248, both pertaining to corporal punishment of students and. therefore, involving personal rights and due process considerations that are not analogous to those here in issue.

constitutional right (cf. *Cornwell* v. *State Board of Education,* 314 F.Supp. 340, 342). We also note that recently a federal court dismissed an action by parents who sought to teach their children entirely at home instead of sending them to school (*Scoma* v. *The Chicago Board of Education* (N.D.Ill. Nov. 13, 1974) 391 F.Supp. 452.[32]

We conclude, therefore, that the trial court properly concluded that, accepting the various allegations of the complaint to be true, the parents have failed to raise any substantial constitutional issues[33] or any factual issues that would entitle them to the declaratory or injunctive relief sought. Accordingly, the county's motion to dismiss the entire complaint was properly granted and the judgment appealed from is affirmed.

Rouse, J., concurred.

**KANE, J.**—I dissent. Notwithstanding the fact that the fundamental question in this appeal is a procedural one, the proper resolution of which renders any discussion of the substantive constitutional issues premature, the majority reaches the latter by a cavalier disposal of the former in a footnote.

In doing so, the majority has reached a conclusion which is contrary to both the spirit and the law of pleading in this state and, in my opinion, has countenanced the unsavory practice of "judge-shopping" which is specifically prohibited by Code of Civil Procedure, section 1008.

The results of the court's holding are (1) an unnecessary treatise on constitutional principles which are discussed in the abstract for the simple reason that the issues raised by the pleadings have not been filled in with evidentiary support and amplification, and (2) a denial of the right of the plaintiffs to attempt to factually prove their bases for relief.

---

[32]In *Scoma,* the court found insubstantial the parents' claim that they had a constitutional right to direct the education of their children as they saw fit and in accordance with their determination of what best serves the family's interest and welfare. The court held that this consideration did not rise above a personal or philosophical choice and cannot claim to be within the bounds of Constitutional protection. In addressing the equal protection argument, the court, citing *Rodriguez,* applied the "rational relationship" test and found no constitutional violation.

[33](Cf. *Hobolth* v. *Greenway* (1974) 52 Mich.App. 682 [218 N.W.2d 98].)

A brief summary of the pleading and procedural history in the court below will demonstrate why plaintiffs are entitled to go to trial and why, therefore, the granting of the motion to dismiss was erroneous.

Having traveled a very tortuous route of demurrers, motions for judgment on the pleadings and summary judgment, followed by a detailed pretrial conference, plaintiffs finally reached the threshold of trial only to be frustrated by a "motion to dismiss"—the legal equivalent of a general demurrer (*McKay* v. *County of Riverside* (1959) 175 Cal.App.2d 247 [345 P.2d 949]).

Except for the first demurrer to the original complaint, defendants' repetitive attack on plaintiffs' pleadings was the single contention that the complaint failed to state a cause of action. In their first demurrer defendants included a special demurrer that "the Complaint is uncertain and unintelligible for the following reasons:

"A. The content of the course mentioned in paragraph IV of the Complaint is not pleaded in sufficient particularity for the Court to make any ruling relating to it

"B. That the Complaint *does not set forth the parts of the proposed course that are alleged to be objectionable and the reasons why said parts are alleged to be objectionable.*" (Italics added.)

It is apparent that plaintiffs conceded the soundness of the special demurrer since the parties stipulated that a first amended complaint be filed which, for the first time included as exhibits excerpts from the teaching material of the Family Life Education course which plaintiffs allege violated various of their constitutional rights.

It is significant to note that once the exhibits were included in the complaint, defendants asserted no further objection as to uncertainty or lack of particularity in the complaint, choosing rather to assert a bare, general demurrer. The demurrer to the first amended complaint was heard by Judge Reisch, who sustained it without leave to amend as to twelve counts contained in two causes of action and overruled it as to eight other counts.

Following that ruling, the defendants answered the first amended complaint. In doing so, no affirmative defenses whatever were set forth.

Next, defendants moved for summary judgment "on the ground that the action has no merit, and that *there is no triable* issue of fact" (and at the same time moved for judgment on the pleadings "on the ground that the Complaint herein *failed to state facts sufficient* to constitute a cause of action.") (Italics added.)

The motion for summary judgment was denied by Judge Scott. The record does not reveal any action on the motion for judgment on the pleadings.

Next, pursuant to stipulation, plaintiffs filed amendments to their first amended complaint to which defendants both answered and demurred generally. The general demurrer was overruled by Judge Blum.

Next, a second motion for judgment on the pleadings "on the ground that the Complaint . . . fails to state facts sufficient to constitute a cause of action" was filed, heard, and denied by Judge Branson.

Thus, four different superior court judges concluded that plaintiffs' complaint did indeed state a cause of action on which they were entitled to go to trial.

Code of Civil Procedure, section 426,[1] which was in effect at the time of the proceedings in the trial court, provided in subdivision 2 that the complaint must contain "A statement of the facts constituting the cause of action, in ordinary and concise language;"

The cases interpreting this provision have made it clear that evidentiary facts or argumentative facts are improper; that only ultimate facts should be pleaded (*Green* v. *Palmer* (1860) 15 Cal. 411, 414; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 268, p. 1939).

While the line between conclusions of law, evidentiary matters and ultimate facts is very elusive and its distinction "is one of degree only" (Witkin, *supra,* p. 1940), the rule of liberal construction is firmly settled in Code of Civil Procedure, section 452. Emphasis is placed on an examination of the pleading to determine whether it gives fair notice of the cause of action (*Leet* v. *Union Pac. R. R. Co.* (1944) 25 Cal.2d 605, 619 [155 P.2d 42, 158 A.L.R. 1008]).

---

[1]Although section 426 was repealed in 1971, subdivision 2 is incorporated verbatim in Code of Civil Procedure, section 425.10, subdivision (a).

In ruling upon a general demurrer (or a motion to dismiss) the allegations of the complaint must be regarded as true. It is assumed that plaintiffs can prove all facts as alleged; defects in the complaint which do not affect the substantial rights of the parties are disregarded.

"Neither trial nor appellate courts should be distracted from the main issue, or rather, the only issue involved in a demurrer hearing, namely, whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action" (*Griffith* v. *Department of Public Works* (1956) 141 Cal.App.2d 376, 381 [296 P.2d 838]).

One of the best statements of the policy behind the rule of liberal construction is set forth in *Terry Trading Corp.* v. *Barsky* (1930) 210 Cal. 428 [292 P. 474], as follows: "It is sometimes a difficult task for the pleader to state enough facts to establish his cause of action or defense, and also to avoid the inclusion of confusing evidentiary matter. The code has provided adequate means for the correction of an error *in either direction;* the adverse party may move to strike out the evidentiary matter or demur specially to an inadequate statement of the facts on the ground of uncertainty or ambiguity. *But to deny the party his right to a trial, there must be an obvious failure of the pleadings to state a cause of action* or defense." (Italics added.)

In the case at bench, even a cursory reading of plaintiffs' final complaint, as amended and including the exhibits, demonstrates that a cause of action has been alleged. For example, in paragraph II of count Eleven of the first amended complaint, it is alleged that "Portions of the content and subject matter of the Family Life Education course of study and subject matter interfere with and are contradictory to certain of plaintiffs' personal religious beliefs, and therefore are an infringement of, in contradiction to, and in violation of Amendment 1 of the Constitution of the United States, in that they are designed to question, affect, prohibit and interfere with the free exercise of existing religious and spiritual practices and beliefs, and to establish new or different religious and spiritual practices and beliefs that are promulgated by the State through its public school system, as illustrated by items contained in Exhibit 'E', which exhibit is attached hereto and is incorporated herein by this reference."[2]

---

[2] Other examples could be set forth since it is clear that plaintiffs followed a pattern of alleging a particular invasion of their rights by utilization of certain material contained in a particular exhibit.

Conceding arguendo that such allegations might be subject to a special demurrer for uncertainty, the fact is that defendants raised no such objection and thereby have waived the same.

The rule of liberal construction of pleadings has also been enhanced by the adoption of the rules for discovery whereby any uncertainty as to the factual basis of plaintiffs' cause of action can be efficiently discovered. Such was the holding in *Dahlquist* v. *State of California* (1966) 243 Cal.App.2d 208 [52 Cal.Rptr. 324].

The body of discovery law has now developed to the point where, for example, it is perfectly proper for a party to submit an interrogatory requiring his adversary to specify, under oath, the facts on which he relies in support of a particular contention or allegation made in a pleading (*Singer* v. *Superior Court* (1960) 54 Cal.2d 318, 321 [5 Cal.Rptr. 697, 353 P.2d 305]). Thus, in the case at bench, if defendants were truly in doubt or uncertain as to how or in what manner plaintiffs' constitutional rights were claimed to be violated by the Family Life Education course, a simple interrogatory would have resolved any such doubt. But the record discloses that defendants engaged in no discovery whatever. It is therefore apparent that after the original demurrer defendants' one and only objection to plaintiffs' pleadings was that they failed to state a cause of action, an objection consistently rejected by four different superior court judges.

This background brings us, then, to the next logical inquiry: How, and by what authority, was a fifth judge empowered to render a decision completely contrary to his predecessors on precisely the same issue? The short answer is that he was not so empowered and that the granting of the motion to dismiss was an abuse of discretion for noncompliance with Code of Civil Procedure, section 1008, which provides: "When an application for an order has been made to a judge, or to the court, and refused in whole or in part, or granted conditionally, or on terms, and subsequent application for the same order, upon an alleged different state of facts, shall be made, it shall be shown by affidavit what application was before made, when and to what judge, what order or decision was made thereon and what new facts are claimed to be shown. For a failure to comply with this requirement, any order made on such subsequent application may be revoked or set aside on ex parte motion.

"A violation of this section may be punished as a contempt; and an order made contrary thereto may be revoked by the judge or commissioner who made it, or vacated by a judge of the court in which the action or proceeding is pending."

The motion to dismiss is, as we have noted, the legal equivalent of a general demurrer *(McKay* v. *County of Riverside, supra).* On review of an order and judgment of dismissal pursuant to the granting of a motion to dismiss, the appellate court must consider the matter "in the same light as a judgment upon sustaining of a demurrer without leave to amend" (*McKay* v. *County of Riverside, supra* at p. 249).

Consequently, as a matter of true substance the motion to dismiss was a "subsequent application" for the same orders previously made to each of the preceding four judges. In fact the motion expressly recites (as did the prior general demurrers and motions for summary judgment and judgment on the pleadings) that it was being made *"on the ground that the complaint herein fails to state a cause of action."* (Italics added.)

The fact that defendants at pretrial received the right to file a motion to dismiss is of no significance whatever. Likewise, the fact that after the filing of the first amended complaint on September 11, 1968 the Legislature enacted Education Code section 8506, is of no moment, either, insofar as the argument is made that this was a "new matter" raised by the motion to dismiss. First of all, section 8506 was enacted in 1969. The ruling by Judge Blum, overruling the general demurrer to the first amended complaint and amendments thereto, was filed on April 15, 1971. The record is silent as to whether Education Code section 8506 was presented to the court. The same is not true, however, in the case of the later ruling by Judge Branson, denying defendants' motion for judgment on the pleadings. There, the points and authorities filed by defendants specifically address the issue of the constitutionality of section 8506. Judge Branson's ruling was filed February 24, 1972.

Thus, it is manifestly clear that the motion to dismiss was and is nothing more than another general demurrer presented to a different judge. Code of Civil Procedure section 1008, is a sound and essential mandate for efficient judicial administration. The fact that the sanction of contempt for a violation of the statute is expressly provided is strong evidence of its importance and the need for maintaining its integrity.

Respondents do not contend that they attempted to comply with section 1008 at all. Their argument is simply that the motion to dismiss was a new motion unrelated to the prior demurrers and motions. As we have shown, however, this contention is totally groundless since each and every prior motion or demurrer—save and except the very first demurrer—raised but one issue: Did the complaint state a cause of action? Having received the rulings of four judges that the complaint did state a cause of action, it was incumbent upon defendants in presenting their motion to dismiss to show "by affidavit what application was before made, when and to what judge, what order or decision was made thereon, and *what new facts are claimed to be shown.*" (Code Civ. Proc., § 1008; italics added.)

The record shows that plaintiffs promptly brought the provisions of section 1008 to the attention of the court by seeking to have the order granting the motion to dismiss vacated.

The pleadings filed by the plaintiffs are technically sufficient. The issues between the parties have been framed and the pretrial order provides an excellent framework in which the case can be tried on its merits. Having arduously and successfully taken their case over nearly every procedural obstacle in the civil advocates' arsenal, plaintiffs should not be denied that right. I would reverse the judgment.

A petition for a rehearing was denied September 26, 1975, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied October 23, 1975.